Dr. Samuel J. DE FREESE and Marsha
Jean Simmons DeFreese, Appellants,

v.

UNITED STATES of America,
Appellee.

No. 17361.

United States Court of Appeals
Fifth Circuit.

Sept. 30, 1959.

Rehearing Denied Nov. 4, 1959.

Arthur D. Herrick, New York City, for appellants.

J. Robert Sparks, Asst. U. S. Atty., James W. Dorsey, U. S. Atty., Atlanta, Ga., Charles D. Read, Jr., Acting U. S. Atty., Atlanta, Ga., for appellee.

Before JONES, BROWN, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This appeal raises a serious question as to whether the Federal Food, Drug, and Cosmetic Act,[1] prohibiting dispensing of certain potentially dangerous drugs without a prescription, applies only to sales at the retail or pharmacist's level. We hold that it applies to bulk sales for resale by a physician, in the circumstances of this case. The appellants raise other points, all of which we consider without merit. We affirm, therefore, the judgment of the district court.

I.

The appellants are husband and wife, not long married. Samuel J. DeFreese practiced medicine for twelve years in Monroe, Georgia. Marsha Jean De-Freese owned and operated a restaurant, Jean's Fine Foods, near Duluth, Georgia, on U.S. Route 23, a route well traversed by long-distance truck drivers.

About eight in the evening of July 26, 1957, Wilbur R. Sumrall, a food and drug inspector posing as a former truck driver, visited Jean's Fine Foods. He asked for Dr. DeFreese. Mrs. DeFreese said that her husband was not in the restaurant. She joined Sumrall at a table and started a conversation. He identified himself as "Bud", a truck driver. During their conversation Mrs. DeFreese spilled some coffee and blamed it on having taken three "bennies"[2] that afternoon to stay awake. Sumrall told her that a friend in Tallahassee, Florida, had sent him to her because he was in the market for several thousand benzedrine tablets. He asked if she had them and what the price would be. After she quoted the price, Sumrall said he would buy 5,000. Mrs. DeFreese went upstairs. After a few minutes she came back to the table and told Sumrall that she had placed the tablets on the third step at the other end of the dining room. Sumrall paid her $75. She told him that she knew of some people in south Georgia who would take some of the tablets off his hands. Sumrall told Mrs. DeFreese he would return when he had disposed of the tablets. She wrote down her name and telephone number on a slip of paper and told him to call her before coming again and not to bring anyone with him.

Sumrall picked up the package and left. He drove down the highway a short distance where he met two other Food and Drug Inspectors. The package was marked and turned over to them. The package contained approximately 5,000 benzedrine tablets.

---

1. 21 U.S.C.A. §§ 301–392.

2. "Bennies" is a slang expression used to describe Benzedrine, a brand name for amphetamine.

Sumrall did not give a prescription to Mrs. DeFreese for the 5,000 tablets. No one made a physical examination of him or asked him any questions about his medical history. Dr. DeFreese was not present at any time during the first meeting between Sumrall and Mrs. DeFreese. Only Mrs. DeFreese was convicted on the count of the information that set forth this transaction.

Both appellants were convicted on the second count for a transaction that took place on July 31, 1957. That afternoon Sumrall telephoned Mrs. DeFreese from Phenix City, Alabama, identifying himself as "Bud" Sumrall from Tallahassee. He said he was doing a little "selling", and he wanted to come up that night and buy 10,000 benzedrine tablets. They arranged to meet at the restaurant. When Sumrall arrived at the restaurant only Dr. Freese was there. Sumrall asked if "Jean" (Mrs. DeFreese) were there. Dr. DeFreese told him that the girls had gone to town. Dr. DeFreese said that Mrs. DeFreese had mentioned that someone was coming up that night and asked Sumrall if he were the one. They introduced themselves. Sumrall told Dr. Freese that he would like to buy "the stuff" and get on the road.

Dr. DeFreese went upstairs for the 10,000 tablets that Sumrall requested. He returned without them because the room where they were kept was locked. Mrs. DeFreese had the key. She returned around one in the morning. Dr. DeFreese told her that Sumrall was in a hurry and that he had not given him the tablets because the room was locked. Sumrall told her he wanted 10,000. She left the room and when she returned he paid her $150 in the presence of Dr. DeFreese. Sumrall walked through the dining room and picked up a package, again on the steps. He drove to his residence with the package where he met another Food and Drug Inspector. The package was marked. It contained approximately 10,000 benzedrine tablets.

The criminal information upon which both appellants were convicted charged that on July 26, 1957, Mrs. Marsha Jean DeFreese, and on August 1, 1957, both Mrs. DeFreese and Dr. Samuel J. DeFreese dispensed a number of dl-amphetamine sulphate (benzedrine) tablets to Wilbur R. Sumrall, Jr. without a prescription, in violation of 21 U.S.C.A. § 353(b)(1) and 21 U.S.C.A. § 331(k).[3]

3. 21 U.S.C.A. § 353(b) (1) provides:
"A drug intended for use by man which—
"(A) is a habit-forming drug to which section 352(d) of this title applies; or
"(B) because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug; or
"(C) is limited by an effective application under section 355 of this title to use under the professional supervision of a practitioner licensed by law to administer such drug,
"shall be dispensed only (i) upon a written prescription of a practitioner licensed· by law to administer such drug, or (ii) upon an oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist, or (iii) by refilling any such written or oral prescription if such refilling. is authorized by the prescriber either in the

original prescription or by oral order which is reduced promptly to writing and filed by the pharmacist. The act of dispensing a drug contrary to the provisions of this paragraph shall be deemed to be an act which results in the drug being misbranded while held for sale."
21 U.S.C.A. § 331(k) provides:
"The following acts and the causing thereof are hereby prohibited:
*      *      *      *      *
"(k) * * * The doing of any other act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded."
21 U.S.C.A. § 333 provides the penalty for violation of any provision of Section 331. The amphetamine sulphate tablets which were sold fall within the scope of 21 U.S.C.A. § 353(b)(1)(B) in that it was a drug intended for the use of man which is not safe for use ex-

Dr. DeFreese denied any sale of the drug to Sumrall. Mrs. DeFreese admitted the first sale but denied the second.

Appellants were tried together on this information before a jury. They were found guilty and sentenced to one year on each count, the sentences for Mrs. DeFreese to run concurrently.

## II.

Appellants argue that Section 353(b)(1), for the violation of which they were convicted, is concerned solely with sales of drugs at the retail or pharmacist's level.[4] The statute reads, in part, that certain categories of drugs

" * * * shall be *dispensed* only (i) upon the written prescription of a practitioner licensed by law to administer such drug, or (ii) upon an oral prescription of such practitioner which is reduced promptly to writing and filed *by the pharmacist,* or

(iii) by refilling any such written or oral prescription if such refilling is authorized by the prescriber either in original prescription or by oral order which is reduced promptly to writing and filed *by the pharmacist.*" (Italics supplied.)

It is contended therefore that the violation arises out of the *dispensing* of such drugs without a prescription. Thus, the same subsection of the statute goes on to say:

"*The act of dispensing* a drug contrary to the provisions of this paragraph shall be deemed to be an act which results in the drug being misbranded while held by sale." (Italics supplied.)

Appellants argue then that the reference to "prescription" indicates that the statute refers only to pharmacists' sales at the retail level to consumers.[5] Otherwise

---

cept under the supervision of a practitioner licensed by law to administer such drug.

4. There is superficial support for this position. Thus, Federal Security Administrator Ewing, in his statement to the House Committee, *supra*, stated: "The bill which is before you, H.R. 3298, *deals with the retail sale of drugs* that have previously moved in interstate commerce and are thus subject to federal regulation." (Italics supplied) Mr. N. E. Cook, Assistant to the Commissioner, Food and Drug Administration, in an address at Temple University School of Pharmacy, March 9, 1953, (reported in Food, Drug, Cosmetic Law Journal, Vol. 8, No. 5 (May, 1953) p. 327) opened his remarks: "The direct application of the Federal Food, Drug and Cosmetic Act to the practice of pharmacy is principally in the provisions of the Durham-Humphrey amendment." Mr. James F. Hoge, an industry attorney, writing in the same journal (Vol. 6, No. 2 (Feb.1951) p. 135), points out: "The bill had its origin in a situation wherein retail druggists perceived a need of clarification either in the law or the administration of the law, or both, with respect to the filling and refilling of prescriptions."

5. Appellants quote Remington's Practice of Pharmacy, (11 ed. 1956), p. 1413 in which the term "prescription" is defined as "the formula which a physician writes, specifying the substance or substances he

intends to have administered to *a patient* with adequate directions for use". In Brown v. United States, 5 Cir., 1958, 250 F.2d 745, 746, however, holding that the Act applies to a licensed physician dispensing drugs, this Court pointed out: "The language of the statute, considered alone, is certainly broad enough to make criminal what was done here [a doctor dispensing 3,000 pills to 'purchaser' who was not 'patient'] * * * The 3,000 tablets were acquired by the 'purchasers,' who were not 'patients,' without even a written or oral prescription, no matter how broadly the word 'prescription' is to be construed." In defining "prescription" under the Harrison Narcotic Act, 26 U.S.C.A. § 2550 et seq., Webb v. United States, 249 U.S. 96, 39 S.Ct. 217, 63 L.Ed. 497, establishes as a criterion the requirement that the physician's order for the drug (in that case, morphine) be "issued by him in the course of professional treatment". Perhaps, the best definition is found in one of the most widely used standard textbooks on the science of pharmacology, entitled, "The Pharmacological Basis of Therapeutics" by Goodman & Gilman, 2d Ed. (1955): A prescription, by strict definition, is a physician's written order to a pharmacist for medicinal substances for a patient. It includes directions to the pharmacist regarding the preparation and to the patient regarding the use of the medicine.

In reality, however, a prescription is infinitely more than can be simply defined.

manufacturers or jobbers would be guilty of violating the law if they placed the drugs in the ordinary channels of trade by selling to a drugstore without a prescription.

Appellants cite a number of decisions.[6] None draw a line between retail and wholesale sales. The best appellants can say for these decisions is that in each case a relatively small number of tablets were sold and ostensibly the drugs were for personal use. There is no language in any of the cases indicating that the court regarded the provisions of the Act as applicable only to retail sales.

In one of the cases relied on by appellants, United States v. Carlisle, 5 Cir., 1956, 234 F.2d 196, 199, the language of the court indicates that *any* dispensing of a drug contrary to the provisions of the act is prohibited:

"It [Congress] did this by setting out in 353(b)(1) the only way in which drugs of the kind dealt with can be dispensed, and then in the same section going on to say that the act of dispensing such a drug, contrary to the provisions of the paragraph, shall be deemed to be an act which results in the drug being misbranded. This established, by law in this section, there is required only resort to 21 U.S.C.A. § 331(k), which denounces the offense of mis-

branding and to Sec. 333, which fixes the penalty for that offense. When this resort is had, the conclusion is inescapable, we think, that the sections taken together have provided as clearly as though it had all been written out in the same section, that one dispensing drugs of the kind dealt with here, contrary to the provisions of Sec. 353(b)(1) shall be guilty of, and subject to the punishment provided by law for, an act of misbranding. This necessarily results from the use in Sec. 353(b)(1) of the language, 'the act * * * shall be deemed to be an act which results in the drug being misbranded while held for sale'."

Brown v. United States, 5 Cir., 1958, 250 F.2d 745, certiorari denied 356 U.S. 938, 78 S.Ct. 779, 2 L.Ed.2d 812, rehearing denied 357 U.S. 933, 78 S.Ct. 1368, 2 L.Ed.2d 1376, controls the disposition of the present case. In the Brown case this Court held that the Act applies to a licensed physician selling amphetamine tablets without a prescription, and not just to pharmacists. Able counsel for appellants attempt to distinguish the Brown case on the ground that Dr. Brown sold in the capacity of a pharmacist,[7] and that no question was raised as to the limitation of the Act to retail sales. In the Brown case there were

---

It is a summary of the physician's diagnosis, prognosis, and treatment of the patient's illness. It brings to a focus on one slip of paper the diagnostic acumen and therapeutic proficiency of the physician. The prescription is an important practical phase in the application of pharmacology to clinical medicine, and combines the knowledge of the absorption, fate, excretion, action, toxicology, and dosage of drugs with the requirements for restoration of the patient's health. (p. 1759).

6. United States v. Arnold's Pharmacy, Inc., D.C.N.J.1953, 116 F.Supp. 310; Archambault v. United States, 10 Cir., 1955, 224 F.2d 925; United States v. Carlisle, 5 Cir., 1956, 234 F.2d 196; United States v. 2600 State Drugs, Inc., 7 Cir., 1956, 235 F.2d 913, appeal denied 352 U.S. 848, 77 S.Ct. 68, 1 L.Ed.

2d 59; Marshall v. United States, 10 Cir., 1958, 258 F.2d 94, reversed on other grounds 1959, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250. In United States v. Arnold's Pharmacy, Inc. a corporation, its treasurer and manager, and its pharmacist were convicted for selling drugs without a prescription, but nothing in the case indicates whether the sale was retail or wholesale. In Archambault v. United States; United States v. Carlisle and United States v. 2600 State Drugs, Inc. the quantities sold are not stated.

7. It has always been the rule that a physician who does his own dispensing is also acting in the capacity of a pharmacist. See Food and Drug Administration Trade Correspondence 174 (March 14, 1940) published in Kleinfeld and Dunn, Federal Food, Drug and Cosmetic Act, p. 637.

three separate sales, each of 1,000 tablets, on March 10, 22, and 23. It is obvious that one person would not consume 3,000 tablets over such a short period of time; that the purchaser was not being treated as a patient or as a consumer making a retail purchase. We rested our decision on broad interpretation of the Act in the light of its objectives.

■ The Federal Food, Drug, and Cosmetic Act was adopted in 1938.[8] Section 353(b)(1), in its present form, is the result of a 1951 amendment to the Act.[9] The purpose of the amendment was to accomplish two broad objectives: (1) To protect the public from abuses in the sale of potent prescription drugs; (2) to relieve retail pharmacists and the public from burdensome and unnecessary restrictions on the dispensing of drugs that are sold for use without the supervision of a physician. House Report No. 700, July 16, 1951, 2 Cong.Serv., 82nd Cong., First Sess.1951, p. 2454. House Report No. 700 explains the amendment at page 2456: "Its provisions are remedial in the sense that they are intended to protect the public from abuses in the sale of potent prescription medicines." If we should adopt the appellants' argument, it would be impossible to accomplish the objective of the amendment. The protection afforded the general public would be dangerously diminished if a person making small retail sales without a prescription may be prosecuted while a person making large wholesale sales of drugs could not be prosecuted for selling without a prescription. We find it impossible to read such a result in the language of the statute or in its legislative history.

The Act as a whole has been liberally construed. In United States v. Sullivan, 332 U.S. 689, 68 S.Ct. 331, 92 L.Ed. 297, it was held that the Act applied to *any* sale after interstate shipment and not just the first sale immediately following interstate shipment. In United States v.

El-O-Pathic Pharmacy, 9 Cir., 1951, 192 F.2d 62, 75, what the court said applies equally well here: "The statute is remedial and should be liberally construed so as to carry out its beneficent purposes. * * *" The appellants' contention that the amendment applies only to wholesale sales would violate the normal rules of statutory construction as well as the spirit of the entire Act. Other portions of the Act apply to wholesale situations. Section 373 requires carriers and persons receiving shipments to keep records. Section 374 allows inspection of warehouses, factories, or establishments where drugs are manufactured, processed, packed, or held, for introduction into interstate commerce. In United States v. Herold, D.C.N.Y.1955, 136 F. Supp. 15, the defendant, who was charged with dispensing drugs without a prescription in violation of Section 331(k), contended that Section 374 allowed only inspections of factories and warehouses. The court rejected this attempt to construe narrowly the applicability of the Act and held that Section 374 allowed inspections of drug stores as well. In Arner Co., Inc. v. United States, 1 Cir., 1944, 142 F.2d 730, certiorari denied 323 U.S. 730, 65 S.Ct. 66, 89 L.Ed. 586, it was contended that the labeling provisions of the Act applied only to retail sales. The court held that it also applied to bulk sales.

The comprehensive scope of the entire Act was pointed to in United States v. 4 Devices, 10 Cir., 1949, 176 F.2d 652, 654:

"The purpose of the Act is to safeguard the consumer by applying its requirements to articles from the moment of their introduction into interstate commerce all the way to the moment of their delivery to the ultimate consumer. * * *"

■ Appellants' contention that the amendment applies only to retail sales is, in effect, predicated upon the assumption

---

8. 52 Stat. 1040.

9. The Durham-Humphrey Bill (H.R. 3298) amended Section 503(b) of the original Act to its present form as it now appears in 21 U.S.C.A. § 353(b) (1). Act 215, c. 578, Sec. 1, 65 Stat. 648.

that the 1951 amendment is to be read alone and not in context with the rest of the Act. However, to read the amendment alone would render it nugatory because it contains neither a prohibitve or a penal clause. It would become meaningles unless construed with the rest of the Act. The amendment simply states that dispensing a drug contrary to its provisions shall be deemed to be an act which results in the drug being misbranded while held for sale. It is Section 331(k) that prohibits misbranding, and Section 333 that sets forth the penalty for misbranding. Section 331(k) applies to *any* act of misbranding. The plain language of the Act therefore covers all sales.

■ Even if Section 353(b)(1) is read alone it will not support appellants' contention that the section is inapplicable to wholesale sales. The section lists three types of drugs and provides that they shall be *dispensed* in one of three stated methods, all of which require a prescription. Dispensing a drug contrary to these provisions is misbranding. The language is clear. The only way that appellants' contention could be sustained would be to interpret "dispensing" to connote retail selling only. Such an interpretation would not be consistent with the commonly accepted meaning of the term and would be carving out an unwarranted exception to the statute. It is not the duty of this court to read exceptions into a statute that is plain on its face.

In related fields of prohibitive conduct the court has rejected such a narrow interpretation as that offered by appellants in this case. A statute which prohibited the sale of narcotics without a written order [10] has been interpreted to apply to all persons making such sales.

Taylor v. United States, 8 Cir., 1956, 229 F.2d 826, certiorari denied 351 U.S. 986, 76 S.Ct. 1055, 100 L.Ed. 1500; Nigro v. United States, 1928, 276 U.S. 332, 48 S.Ct. 388, 72 L.Ed. 600.

■ Appellants argue that if Section 353(b)(1) applies to sales other than retail sales pharmaceutical houses and drug companies should also be prosecuted for selling drugs without a prescription. We are not faced with this issue here. However, the statute give the Secretary of Health, Education, and Welfare broad powers to make exemptions to the requirements of the Act. Section 353(b)(3) empowers the Secretary to issue regulations removing "habit-forming drugs" [11] and "new drugs" [12] from the requirements of Section 353(b)(1) when such requirements are not necessary for the public health. Pursuant to this authority, the Secretary has provided exemptions from the prescription-dispensing requirements for certain habit-forming drugs. 21 CFR 1.108(a). Exemptions have also been made for certain new drugs. 21 CFR 1.108(c). Drugs within the legitimate channels of distribution are exempted from certain labeling requirements of the Act. 21 CFR 1.106(b)(1). As we read the regulations, as a whole, we interpret them as properly exempting wholesale distribution of amphetamine from the prescription requirements of Section 353(b)(1), when the drug is distributed in ordinary channels of trade, i.e. sales to physicians, pharmacists, and drugs stores without the necessity of a prescription. For example, United States v. El-O-Pathic Pharmacy, 9 Cir., 1951, 192 F.2d 62, 75, involved an injunctive suit to prohibit violations of various sections of the Federal Food, Drug, and Cosmetic Act. It was argued that the only power conferred upon the Administrator [13] was the au-

---

10. 26 U.S.C.A. § 2554(a), I.R.C. of 1939.

11. "Habit-forming drugs" are those containing any quantity of the substances set forth in 21 U.S.C.A. § 352(d).

12. "New drugs" are those described in 21 U.S.C.A. § 355.

13. Prior to the creation of the office of Secretary of Health, Education, and Welfare, the Federal Security Administrator was empowered to issue regulations concerning the Federal Food, Drug, and Cosmetic Act.

thority to issue regulations exempting drugs from the requirement of "adequate directions for use", when that requirement "is not necessary to the protection of the public health". The court held that the Administrator also had the power to issue regulations providing the drugs be exempted from the requirement of adequate directions for use *provided* that the label state that the drug be used only on the prescription of a physician. If the regulations may require that a drug be sold on a prescription or contain adequate directions for use, it is well within the scope of authority of the Secretary to make exemptions from the prescription-dispensing requirements where the drugs are sold within the legitimate channels of wholesale distribution.

In short, the fact that the crime in this case is wholesale, instead of retail, gives it no special claim to immunity.

### III.

We have considered carefully all of the specifications of errors in this case.

■ A. We find that the trial court did not err in failing to dismiss the information against Dr. DeFreese on the ground that the evidence did not connect him with the transaction charged in the information.

■ B. We find that the trial court did not err in refusing to grant the motion for separate trials for the defendants. There was no prejudice to either.

C. The defendants received a fair trial.

■ D. The trial court correctly held that there should not be a mistrial based on counsel for the government characterizing Dr. DeFreese as a criminal. The court stated that he did not understand the United States Attorney to call Dr. DeFreese a criminal, "but if so then I instruct the jury to disregard it, it would be improper if he did call Dr. DeFreese [a criminal]."

Judgment is

Affirmed.