Robert William BENDELOW, Appellant,

v.

UNITED STATES of America, Appellee.

No. 25551.

United States Court of Appeals
Fifth Circuit.

Sept. 29, 1969.

Godbold, Circuit Judge, dissented in part.

Thomas S. Biggs, Jr., Jacksonville, Fla., for appellant.

Edward F. Boardman, U. S. Atty., Gary B. Tullis, Asst. U. S. Atty., Jacksonville, Fla., for appellee.

Before WISDOM, GODBOLD and SIMPSON, Circuit Judges.

SIMPSON, Circuit Judge:

Bendelow appeals from a judgment of conviction and sentence to confinement for five years following a jury verdict of guilty. He was charged by a single count information with violation of the Dyer Act, Title 18, U.S.C. § 2312, for the interstate transportation on or about September 16, 1967, of a stolen 1960 white Cadillac convertible, from Emigrant Gap, California to the Middle District of Florida.

He seeks reversal of his conviction on several grounds of asserted error: (1) failure of the government to prove the essential elements of the offense, (2) because the jury was allowed to consider evidence which was not the best evidence as to identification of the vehicle, as well as evidence which resulted from an "in-custody interrogation" in which Bendelow was not warned of his rights, (3) because the government was permitted over objection to cross-examine him improperly concerning prior felony convictions and (4) finally, because his representation by court-appointed counsel was so ineffective as to de-

prive him of his constitutional right to counsel.

We are not persuaded that prejudicial error occurred in any or either of the particulars claimed and accordingly affirm the judgment below.

■ Inasmuch as the sufficiency of the evidence to sustain conviction is involved in appellant's first point, we state the facts brought out in the evidence in the light most favorable to the appellee. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

Mrs. Maria Lekas during the late summer of 1967 was temporarily taking care of a retail grocery store and filling station for her hospitalized brother, and for this reason residing temporarily in Emigrant Gap, California, deep in the Sierra Nevada Mountains between Sacramento and Reno. About a block from her abode was the Rancho Sierra Lodge, a small hotel. It contained a bar where she frequently spent the evening hours. The recreational facilities of Emigrant Gap appear to have been severely limited. After such evenings, Lekas often walked home and left her 1960 white Cadillac convertible in the well-lighted lodge parking lot to be retrieved the following morning.

Bendelow came to work at the lodge bar as bartender the last week in August, 1967. He worked five evenings that week, during three of which Lekas was a customer in the bar. Such conversations as she had with Bendelow were casual, and she never gave him permission to use her car.[1] Thursday night, August 31, 1967, while Lekas was talking to friends at the bar, Bendelow picked up her car keys which lay on the bar counter. Bendelow at trial insisted that he returned the keys, but Lekas testified that he kept them and that she received them from Florida when her car was returned to her.

On Saturday night, September 2, Lekas parked her car in the Lodge parking lot as usual. She left her purse, containing a second set of keys in the car. At trial Lekas testified that she asked Bendelow Saturday night for the keys picked up from the counter earlier, and that he said he had returned them Thursday night. His trial testimony appears to be to the same effect. Saturday night Lekas again walked home, leaving the Cadillac in the lot. The following morning about eleven when she returned for it, the car was gone. Bendelow was also missing from the Lodge. She reported the car stolen to California authorities immediately. She next saw the car when it was returned to her from Florida. On September 16, 1967, Patrolman Hart of the Florida Highway Patrol stopped Bendelow on U.S. Highway 17 near Yulee, Florida. He was driving the Lekas Cadillac.[2] When the trooper asked for identification, Bendelow displayed a California driver's license identifying him as Mario Persudo. The trooper's testimony as to what occurred at the time is detailed in Part II of this opinion.

---

1. Bendelow in his testimony claimed use of the car with Lekas' permission for trips to Reno on at least two occasions during the week and testified further that with her permission he drove the car to Buffalo, New York, the home of his parents. He said he could not find them and was en route to Haines City or Winter Haven, Florida in search of them at the home of other relatives when he was arrested. He testified also to driving with her to Lake Tahoe to indulge in gambling after closing the bar on the second evening he knew her, and generally to a closer friendship than Mrs. Lekas admitted under extended cross-examination.

2. The trooper said the car bore a California license tag, number NCV 333. F.B.I. Special Agent King identified the car as belonging to Mrs. Lekas by the identification number and as bearing California license plate number NCZ 333. If doubt existed, as Bendelow contends, that the same car was being described, that doubt is resolved against Bendelow by the jury's verdict. Mrs. Lekas produced at trial the California registration of the car to her under number NCZ 333 under the correct identification number.

## I.

Bendelow argues that the trial judge should have granted his motions for judgment of acquittal because the government failed to prove each element of the offense, specifically that there was no evidence which connected him with Lekas' car. The facts recited above, in the text and in footnote 2, put this contention to rest. Despite the earnestness with which it is argued, it is groundless.

Trooper Hart at trial identified Bendelow as the driver of the white 1960 Cadillac convertible stopped by him in Yulee, Florida on September 16. F.B.I. Special Agent King testified that as a result of a communication from the Florida Highway Patrol he examined a car at Yulee, a 1960 white Cadillac convertible, license tag NCZ 333, vehicle identification number 60F025334; that as a result of this examination he communicated with his California office, and as a result of that communication proceeded to the Nassau County Jail (Yulee is in Nassau County, Florida) where he found the appellant Bendelow and interviewed him. The license tag quoted by King differed by one letter, the substitution of Z for V, from the one quoted by Trooper Hart; both the tag number and identification number quoted by King were identical to those shown on the California registration produced by Lekas at trial and received in evidence as a government exhibit.

Bendelow contradicted much of the government testimony. He was insistent in his assertions that he had Lekas' permission to use her car to drive east to New York State. But legitimate credibility choices are for juries, not for appellate courts. Taking the view of the testimony most favorable to the government, as we must,[3] we find it amply sufficient to sustain the guilty verdict below.

## II.

Bendelow's next contention is that certain evidence submitted to the jury was the result of an "in-custody interrogation" in which the required warnings of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were not given. Upon receiving information from the Georgia Highway Patrol that the driver of a Cadillac convertible with a certain license number had threatened a service station attendant in Georgia when the attendant had refused to honor a credit card, Patrolman Hart stopped the Cadillac near Yulee, Florida, and asked the driver, Bendelow, for his driver's license and automobile registration. After Bendelow got out of the automobile, at Hart's request, Hart noticed that the name on the driver's license had been altered by changing Maria to Mario,[4] and that the identifying photograph on the license was glued over the picture of a woman. The license data as to age, height and weight also appeared altered. When Bendelow was unable to give a satisfactory explanation of the alteration and pictures, Hart placed him under arrest for unlawfully displaying the driver's license of another and took him to the Nassau County Jail at Fernandina. After the F.B.I. learned that the automobile was stolen, Bendelow was charged with violation of the Dyer Act.

At trial, Hart testified only to the number on the license tag, the presence of Bendelow in the automobile and the name, Mario Persudo, which appeared on the driver's license displayed by Bendelow. At this point in Hart's testimony, the jury was excused. The circumstances of the arrest just set forth were related only as a proffer of proof, in the jury's absence. The trial judge allowed no testimony from Hart concerning the alterations or any statements made by Bendelow concerning them, ruling that

---

3. Glasser v. United States, supra; Ruiz v. United States, 5 Cir., 1967, 374 F.2d 619.
4. Curiously, government counsel never asked Lekas to state her name before marriage, or whether it was ever Persudo. This may or may not have been the case. Of course, since the circumstances of Bendelow's producing the driver's license were excluded, he was not questioned about it when he took the stand.

such testimony would run afoul of Miranda v. Arizona, supra, and Fendley v. United States, 5 Cir. 1967, 384 F.2d 923. Bendelow contends that testimony concerning the tag number, his presence in the automobile and the name on the driver's license was submitted to the jury in violation of *Miranda*. We disagree. Our case of Jennings v. United States, 5 Cir. 1968, 391 F.2d 512, is controlling. In *Jennings,* a Fort Pierce, Florida police officer was informed by someone (reliability not stated) that a certain 1962 Chevrolet Impala with a red stripe painted on it and bearing South Carolina license number E13–133, 1966 was a stolen car. He set out to look for it, and had spotted it near a beer and wine joint called "Across the Ditch" when Jacob Jennings came out of the establishment and asked "What do you want? What's the matter?" When asked by the officer if he was the driver of the car, Jennings said "Yes", and when the officer asked if he had a driver's license he also said "Yes", and handed the officer a South Carolina driver's license bearing the name James Campbell, and describing a man 5 feet 11 inches in height and 49 years of age. Jennings appeared to the officer to be in his twenties and was much shorter than five eleven, so the officer asked for the registration for the car. This was produced and was also in the name of James Campbell, describing the car as a 1962 Chevrolet, South Carolina license number E13–133. The officer then arrested Jennings but told him he would not question him further until he got to the police station. In disposing of a contention that this testimony was custodial interrogation, inadmissible under *Miranda,* supra, we said:

"It is now urged that before officer Blakely could ask Jennings his name or take his driver's license or ask for the automobile registration papers he

was required to warn him of his constitutional rights in the manner required by Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966). * * *

"We are of the opinion that under the circumstances of this case Miranda did not require a warning from the officer prior to the arrest. This was not custodial interrogation.

"[1] The appellant, a grown man, with at least one prior unfortunate experience with the law, approached the officer and opened the episode by asking what the matter was, what the officer wanted. When the officer asked him for the driver's license and the registration papers, he freely handed them over, after first identifying himself by the name which he knew appeared on those papers. There was nothing forced or coercive about this, unless it can be said that even when a traffic officer stops an automobile on the highway he must first give the Miranda warnings before he can ask the name of the driver and request production of a driver's license. Evidently, the officer was not satisfied about the reliability of his information as to the white car bearing the red stripe until an individual voluntarily confronted him and said he was the driver but produced papers which clearly belonged to someone else. This case is perfectly analogous to the factual situation in Evans v. United States, 5 Cir. 1967, 377 F.2d 535, except in that case the F.B.I. agents sought out the subject in her own home. We held that there was no custodial interrogation and that Miranda did not apply." (Footnotes omitted)

■ The Florida Highway Patrol is authorized by law to stop automobiles and check licenses.[5] Hart testified, out

---

5. Florida Statutes Annotated, Section 321.05, in addition to declaring the director and members of the Florida Highway Patrol to be "conservators of the peace of the state, with the common law right to arrest * * *" in sub-

section (1) enumerates specific duties, functions and powers: "(1) To patrol the state highways and regulate, control and direct the movement of traffic thereon; * * * to require the drivers of vehicles to stop and exhibit their driver's licenses,

of the presence of the jury, that he had no authority to hold Bendelow regarding the alleged Georgia offense, and that Bendelow would have been free to go had the license not been altered.[6] We agree with the trial judge that after Hart discovered the alterations in the license the investigation focused upon Bendelow and a *Miranda* warning was in order before any statement by Bendelow would be admissible. Prior to that time no warning was required because there was no "in-custody interrogation" as prohibited by *Miranda* and its progeny including *Fendley*, supra. See Jennings v. U. S., supra, Evans v. United States, 5 Cir. 1967, 377 F.2d 535. It was not error to refuse to strike the trooper Hart's testimony given before the jury.

■ Bendelow further contends on brief that reception of the officer's testimony in lieu of requiring production of the driver's license itself violated the "best evidence" rule. No objection on this ground was made at trial and the error, assuming error was present, was not "plain error" requiring our notice under Rule 52(b), Federal Rules of Criminal Procedure. It is pertinent to add that pursuit of the matter by *voir dire* for the purpose of objection would doubtless have disclosed whether the Trooper had retained the document and could produce it, whether representatives of the prosecution had custody of it, or whether it was returned to the defendant and was thus protected from coerced production by him under the Fifth Amendment. We are left to speculation as to the result of such an evidentiary excursion. Error is not demonstrated.

### III.

■ Bendelow also insists that the government was allowed to cross-examine him improperly concerning prior felony convictions and particularly convictions

registration cards or documents required by law to be carried by such vehicles; * * * "

6. Florida law makes it a misdemeanor to display a fraudulently altered license,

under the Dyer Act. During cross-examination Bendelow was interrogated as follows:

"Question: Mr. Bendelow have you ever been convicted of a felony?"

Bendelow's counsel objected after which an extended discussion was held out of the presence of the jury concerning the propriety of the question. After this discussion was concluded the jury returned and the interrogation continued as follows:

"Question: Mr. Bendelow, have you ever been convicted of a crime involving transportation of a motor vehicle in interstate commerce, knowing the vehicle to have been stolen?

Answer: I was convicted of a charge of transporting a motor vehicle which was reportedly stolen, but at the time I transported it, I didn't know it was stolen. It was leased from a car rental agency in Chicago, Illinois, and subsequently taken out of the state and an arrest made.

Question: How many times were you convicted of it?

Answer: There were two occasions.

Question: You were convicted of transporting another motor vehicle?

Answer: This is true.

Question: —in interstate commerce?"

After closing arguments had been completed, the trial judge charged the jury as follows:

"Evidence of a defendant's previous conviction of a felony is to be considered by the jury only insofar as it may affect the credibility of the defendant as a witness and must never be considered as evidence of guilt of the crime for which the defendant is on trial."

We reject Bendelow's contention that the interrogation concerning prior convic-

F.S.A. Sec. 322.32(1), or for any person to display or represent as his own any operator's license not issued to him, F.S.A. Sec. 322.32(3).

tions was prejudicial and improper. His testimony was in direct conflict on numerous critical points, including the owner's consent to use the vehicle, with that of Lekas, the owner. When Bendelow took the stand he was subject to impeachment to the same extent as any other witness.[7]

With respect to the crucial matters in dispute the jury was required to accept as credible either the testimony of Bendelow or the testimony of Lekas. Proof of prior convictions is of course one of the primary accepted means of impeaching the credibility of a witness, including the defendant in a criminal case.[8]

In Beaudine v. United States, 1966, 368 F.2d 417, in dealing with the scope of such cross-examination of the principal government witness as to prior convictions we pointed out, 368 F.2d at page 421, that "the one attacking credibility was entitled, at least in the first instance, to establish the number of convictions, the nature of each of the crimes charged, the date and time of each conviction".

In overruling objections to the examination of Bendelow quoted above, the trial judge stated expressly that he was relying on *Beaudine* as the basis for his ruling. It is to be noted that the cross-examination of appellant did not extend to the outer limits of permissibility set out in *Beaudine*.

Nonetheless Bendelow's counsel strenuously argued on brief and in oral argument that the fact that the two prior convictions brought out were *Dyer Act* convictions resulted in undue prejudice to Bendelow. He urges that *Beaudine was* improperly followed as authority below since the witness under impeachment in *Beaudine* was a government witness, whereas here the *defendant* was the witness whose credibility was thus attacked. The argument goes that the identity of the nature of the prior offenses with the offense on trial necessarily resulted in ineradicable prejudice in the minds of the jury out of all proportion to the materiality of the testimony to the issue of credibility as to which it was received. It is contended further that the court's salutary sua sponte warning quoted from the general charge, supra, page 10, was insufficient to sanitize the minds of the jury of the prejudice thus planted.

The argument is entirely *ad hominem*. No authority was cited on brief for this proposition and counsel admitted at oral argument that he had found none. The rather meager authority found by our research is to the contrary. See McCormick on Evidence, (1954 Edition) Sec. 43, pages 93 and 94. Professor McCormick says, op. cit., page 94, after outlining the problem of the likelihood of prejudicing the rights of an accused by such impeachment:

> "Where does the balance of justice lie? Most prosecutors would say with much force that it would be unfair to permit the accused to appear as a witness of blameless life, *and this argument has generally prevailed*". (Emphasis added)

The author goes on to point out that England and Pennsylvania by statute, and the Uniform Rules of Evidence shield the accused who takes the stand from such examination under certain circumstances. Professor McCormick ends his discussion by suggesting that, on balance, this is a more just, humane and expedient view than the *prevailing practice*. See also, generally, 29 Am.Jur.2nd, Evi-

---

7. Taylor v. United States, 5 Cir. 1960, 279 F.2d 10, Daniel v. United States, 5 Cir. 1959, 268 F.2d 849, Roberson v. United States, 5 Cir. 1957, 249 F.2d 737, 72 A.L.R.2d 434, cert. denied 356 U.S. 919, 78 S.Ct. 704, 2 L.Ed.2d 715 (1958), Steel v. United States, 5 Cir. 1957, 243 F.2d 712, Newman v. United States, 5 Cir., 1955, 220 F.2d 289, cert. denied 350 U.S. 824, 76 S.Ct. 51, 100 L.Ed. 736 (1955),

Kemp v. Government of Canal Zone, 5 Cir. 1948, 167 F.2d 938, Matthews v. United States, 5 Cir. 1944, 145 F.2d 823, 4 Jones on Evidence, § 927, at 1738 (1958).

8. United States v. Sanders, 5 Cir. 1969, 412 F.2d 854; Beaudine v. United States, 5 Cir. 1966, 368 F.2d 417, Whalen v. United States, 5 Cir. 1966, 367 F.2d 468.

dence, Sec. 327, page 378, Wharton's Criminal Evidence, Volume 3, Sec. 946, page 383.

The practice of permitting such cross-examination has prevailed heretofore in this Circuit, although the cases to this effect dealing with prior convictions for similar offenses are few in number, and the point has not been squarely presented on the issue of *undue prejudice*. Typical of our prior cases are the following:

In Newman v. United States, 5 Cir. 1955, 220 F.2d 289, the conviction below was for a liquor law violation. During cross-examination, the prosecutor questioned the appellant at length about prior liquor law convictions, and this was permitted over objection that appellant's character was not in issue and that the information was not impeaching of any evidence given on direct. We disposed of this contention as follows:

"[1] Appellant had, of course, testified as to facts tending to exonerate himself of the charges, and his credibility as a witness was certainly in issue. The evidence of prior convictions was restricted in the offer and in the charge to impeachment of appellant's credibility, and was admissible for that purpose." (Footnote omitted)

In Daniel v. United States, 5 Cir. 1959, 268 F.2d 849, the appellant charged with a liquor law violation was asked on cross-examination about an earlier liquor law conviction in 1946, 12 years prior to trial. There the objection, on the ground of remoteness in time was made at the time of submission of the case to the jury, rather than when the question was asked. The conviction was affirmed.

In Kemp v. Government of Canal Zone, 5 Cir. 1948, 167 F.2d 938, we affirmed a first degree murder conviction carrying a death penalty where the appellant on cross had been required over objection to answer as to prior robbery and second degree murder convictions. The trial court instructed the jury that these convictions could not be considered as evidence of guilt, but only as affecting credibility. We said, through Judge Sibley:

"In this there was no error. When a defendant takes the witness stand in his own defense he is subject to impeachment like any other witness."

Our per curiam decision in Taylor v. United States, 5 Cir. 1960, 279 F.2d 10, approved admission, in a criminal trial for several counts involving an illicit distillery, of evidence of a prior liquor law violation by cross-examination of the defendant on trial. The court said the objection below was on the ground that the accused's answer was not the best evidence of the prior conviction, not on the ground that his character was not put in issue. Cf. Kemp v. Government of Canal Zone, supra. The court also noted both the lack of an instruction limiting consideration of the prior conviction to the credibility issue and the lack of a request therefor. The conviction was affirmed.

Thus the precedent in this Circuit cannot be said to be satisfactory in the sense that the precise attack launched here has been disapproved, but without any exception revealed by our research, we have never reversed a conviction on the ground that proof of similar violations was permitted to go to the jury, however the point was presented.

We repeat our earlier observation that the meager authority available is against the appellant.

Rule 26, F.R.Crim.P. provides "the admissibility of evidence * * * shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience". Absent the compulsion of an authoritative decision, we are unwilling to sponsor for this Circuit a rule which would immunize a criminal defendant from attacks on his credibility by proof of prior convictions so long as he is careful to repeat his original offense in subsequent transgressions. The conviction will not be set aside on this ground.

## IV.

Bendelow urges finally that his court-appointed trial counsel was so inadequate and so ineffective as to deny him his Sixth Amendment right to Assistance of Counsel. We recently had occasion in Odom v. United States, 5 Cir. 1967, 377 F.2d 853, 22 A.L.R.3d 705, to review the standards for effective assistance of counsel, examining, among others, the cases listed in the margin.[9]

The constitutional standard as set forth by Judge Wisdom for this Court in McKenna v. Ellis (footnote 9) was again quoted with approval, as it has been many times before:

"We interpret counsel to mean not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* reasonably effective assistance." 280 F.2d at 599.

It was made clear in *Odom* that errors in judgment, "matters of instantaneous courtroom judgment and trial tactics", matters of trial strategy tested by hindsight and like criticisms do not begin to approach violation of the constitutional right to counsel. *Odom* spoke with approval of such criteria as "shocking to the conscience of the Court" (Scott v. United States, footnote 9) and "so incompetent as to deprive his client of a trial in any real sense—render the trial a mockery and a farce is one descriptive expression". (Mitchell v. United States, footnote 9, 259 F.2d at 793). Success is not the test as Judge Goldberg iterated for us in *Odom* in his characteristically colorful language: "He who wars must sometimes win and sometimes lose. The Constitution, it must be remembered, commands a battle, but not a victory". Odom, supra, 377 F.2d at 859.

Certainly Bendelow's trial counsel was not successful, as witness this appeal. But neither was he ineffective in the constitutional sense any more than was different court-appointed counsel ineffective on this appeal, simply because we affirm the trial court. Trial counsel objected, and for imaginative and plausible reasons on most close points through the trial. In general he labored assiduously and faithfully to protect Bendelow's rights. Bendelow's counsel, for example, is criticized for permitting him to take the stand and testify in his own defense when the government failed to present a prima facie case. This claim is destroyed, if it ever had colorable merit, by Part I of this opinion, in which we demonstrate that the government presented a strong case. Close scrutiny of the record leaves us with the firm conviction that Bendelow had adequate, albeit unsuccessful representation below. His attorney did a workmanlike job in combatting a strong government case, precisely as his present counsel has done on appeal.

The judgment of conviction was right. It is

Affirmed.

GODBOLD, Circuit Judge (concurring in part, dissenting in part).

I agree with Judge SIMPSON'S opinion except with respect to the impeachment of appellant by reference to previous convictions in Dyer Act cases.

This Circuit recognizes that the trial judge considering potentially prejudicial evidence has discretion to balance relevant factors and determine whether probative value is outweighed by prejudicial effect. The examples are legion. I set out a few in the margin.[1]

---

9. Scott v. United States, 6 Cir. 1964, 334 F.2d 72, cert. denied 379 U.S. 842, 85 S.Ct. 81, 13 L.Ed.2d 48 (1964); Pineda v. Bailey, 5 Cir. 1965, 340 F.2d 162; McKenna v. Ellis, 5 Cir. 1960, 280 F.2d 592; Johnson v. United States, 8 Cir. 1966, 362 F.2d 43; United States v. Duhart, 2 Cir. 1959, 269 F.2d 113; Mitchell v. United States, 1957, 104 U.S.

App.D.C. 57, 259 F.2d 787, cert. denied 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86 (1958); and Burton v. United States, 1945, 80 U.S.App.D.C. 208, 151 F.2d 17, cert. denied 326 U.S. 789, 66 S.Ct. 473, 90 L.Ed. 479 (1946).

1. Goddard v. United States, 131 F.2d 220 (5th Cir. 1942), cited with approval in

The careful opinion by Judge Simpson declines to establish an authoritative rule for this Circuit which would immunize a criminal defendant from attacks on his credibility by proof of prior convictions for the same offense. My brothers do not indicate that the trial judge lacks discretion. They create an imperative rule in neither direction.[2] Indeed the fact that they do not establish a mandatory rule undergirds the existence of trial court discretion.

It is my view that the trial judge either failed to recognize that he had discretion or reversibly exceeded the bounds of his discretion. It is understandable that he might do so, because, as my brothers point out, we deal with a matter never squarely decided in this Circuit and in which the authority is meager.[3]

Most of the writing springs from the Court of Appeals of the District of Columbia, where the trial judge's discretion arises from construction of a local statutes. But the considerations relating to exercise of discretion are no different. The leading case is Luck v. United States, 121 U.S.App.D.C. 151, 348 F.2d 763 (1965), in which Judge McGowan set out these factors:

> In exercising discretion in this respect, a number of factors might be relevant, such as the nature of the prior crimes, the length of the criminal record, the age and circumstances of the defendant, and, above all, the extent to which it is more important to the search for truth in a particular case for the jury to hear the defendant's story than to know of a prior conviction. The goal of a criminal trial is the disposition of the charge in accordance with the truth. The possibility of a rehearsal of the defendant's criminal record in a given case, especially if it means that the jury will be left without one version of the truth, may or may not contribute to that objective. The experienced trial judge has a sensitivity in this regard which normally can be relied upon to strike a reasonable balance between the interests of the defendant and of the public.

348 F.2d at 769. In Gordon v. United States, 127 U.S.App.D.C. 343, 383 F.2d 936 (1967) Judge (now Chief Justice)

---

McCormick, Evidence, § 43, at 91 (1954) (conviction too remote in time); Lloyd v. United States, 226 F.2d 9 (5th Cir. 1955) (prosecution's use of charts); De Freese v. United States, 270 F.2d 730 (5th Cir.), cert. den. 362 U.S. 944, 80 S.Ct. 810, 44 L.Ed.2d 772 (1959) (qualifications of expert witness for prosecution); Beck v. United States, 317 F.2d 865 (5th Cir.), cert. den. 375 U.S. 972, 84 S.Ct. 480, 11 L.Ed.2d 419, rehearing denied, 376 U.S. 929, 84 S.Ct. 656, 11 L.Ed.2d 627 (1963) (attempt to rehabilitate prosecution witness with testimony which also imputed prior misconduct to the defendant); Burns v. Beto, 371 F.2d 598 (5th Cir. 1966) (use of vivid photographs); Beatty v. United States, 377 F.2d 181 (5th Cir.), reversed 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967) (materiality under F.R.Crim.P. 26 of various items of prosecution evidence); Barnett v. United States, 384 F.2d 848 (5th Cir.), rehearing denied 391 F.2d 931 (5th Cir. 1967) (collateral evidence of wrongdoing introduced to show intent); Sutton v. United States, 391 F.2d 592 (5th Cir. 1968) (evidence of similar crimes introduced to show intent).

An abuse of discretion unduly prejudicing the defendant may be reversed. Belvin v. United States, 273 F.2d 583 (5th Cir. 1960) (trial judge abused his discretion in allowing evidence on rebuttal).

2. In United States v. Palumbo, 401 F.2d 270 (2d Cir. 1968) the government contended that the trial judge had no discretion to exclude the prior convictions. The Second Circuit, after carefully considering the matter, held that the trial court had discretion to balance probative value against prejudice, that he did exercise his discretion, and that he did not abuse it.

3. The trial court expressly relied on Beaudine v. United States, 368 F.2d 417 (5th Cir. 1966). Because of his express reliance it seems likely to me that he considered he had no discretion. In any event, *Beaudine* concerned attacking credibility of a government witness by evidence of prior convictions. In that case there was no problem of prejudice to the defendant.

Burger expanded on the *Luck* test with considerable specificity, setting down several rules of thumb to aid the trial courts. He considered convictions for dishonesty to be more readily admissible than those for violent or assaultive crimes, which may result from a short temper, provocation, or combative nature and are unrelated to honesty or veracity. Remoteness is a factor. Also the judge may wish to exclude the potentially prejudicial matter in order to make it possible for the defendant to take the stand and from his mouth give his version of the case rather than remain silent for fear of damaging impeachment. With respect to the particular problem raised by the instant case the Court said in *Gordon:*

> A special and even more difficult problem arises when the prior conviction is for the same or substantially the same conduct for which the accused is on trial. Where multiple convictions of various kinds can be shown, strong reasons arise for excluding those which are for the same crime because of the inevitable pressure on lay jurors to believe that "if he did it before he probably did so this time." As a general guide, those convictions which are for the same crime should be admitted sparingly; one solution might well be that discretion be exercised to limit the impeachment by way of a similar crime to a single conviction and then only when the circumstances indicate strong

reasons for disclosure, and where the conviction directly relates to veracity.

383 F.2d at 940.[4]

In the instant case the prosecutor had another conviction by which he could impeach the defendant, for issuance of a fraudulent check, which bore directly on honesty. But he elected to ask about only the Dyer Act convictions and disclaimed asking about the check case.[5] In these circumstances the rationale that the prosecution was seeking with the only, or even the best, tool to probe the defendant's veracity is palpably inapplicable.

Within the range of the trial court's discretion, the interest of both prosecution and defendant could have been protected by simply limiting the interrogation. The choice was not solely between letting the defendant appear as "a witness of blameless life," McCormick Evidence, p. 94 (1954), and having him appear as a twice-convicted Dyer Act violator. All that was necessary with respect to the Dyer Act cases was to restrict the testimony to the number of convictions and the fact that they were felonies, without any reference which would give the jury to understand that they were for precisely the same offense. The prejudice to appellant would have been removed. The prosecution would have obtained substantially all the legitimate benefit it sought by showing the appellant not credible because a repeti-

---

4. In *Gordon* the Court recognized the deference due the trial judge's exercise of discretion, 383 F.2d at 939. In other cases that Court has reversed for failure to exercise discretion or abuse of discretion. Brown v. United States, 125 U.S.App.D.C. 220, 370 F.2d 242 (1966); Barber v. United States, 129 U.S.App. D.C. 193, 392 F.2d 517 (1968); Jones v. United States, 131 U.S.App.D.C. 88, 402 F.2d 639 (1968); Pinkney v. United States, 124 U.S.App.D.C. 209, 363 F.2d 696 (1966).

5. In cross-examination Bendelow was asked whether he had been convicted of a felony. After objection the jury was excused. It then was developed that appellant had two Dyer Act convictions

and the bad check charge. The following colloquy then occurred:

"MR. TULLIS [Ass't U.S. Attny]:

Your Honor, I don't want to go any further than to show that he has been convicted of a Dyer Act, which is what he, of course, is being charged with here.

THE COURT:

Well, do you want to ask him about the no account check?

MR. TULLIS:

No, Your Honor. All I want is this Dyer Act—of course, I want him to explain the nature of the crime in such a way that the Jury will understand. They won't know what the Dyer Act is."

tive felon. The difference between lack of credibility as a repetitive felon and lack of credibility as a repetitive car thief was negligible to the prosecution, catastrophic to the accused.

I would reverse for failure of the trial judge to exercise the discretion he possessed by either forbidding entirely the inquiry into previous Dyer Act convictions or by limiting the inquiry in such way as not to reveal that they were for the same offense with which defendant was charged.