445 F.2d 178
 UNITED STATES of America, Plaintiff-Appellee,
v.
James Benjamin BRAY, Defendant-Appellant.
No. 31006 Summary Calendar.*
*(1) Rule 18, 5th Cir.; see Isbell Enterprises, Inc.
v.
Citizens Casualty Co. of New York et al., 5th Cir. 1970, 431
F.2d 409, Part I.
 United States Court of Appeals, Fifth Circuit.
 June 25, 1971, Rehearing Denied Aug. 6, 1971.
 
 Thomas L. Bass, Macon, Ga., for appellant.
 William J. Schloth, U.S. Atty., D. L. Rampey, Jr., AUSA, Asst. U.S. Atty., Macon, Ga., for appellee.
 Before THORNBERRY, MORGAN and CLARK, Circuit Judges.
 THORNBERRY, Circuit Judge:
 
 
 1
 In this Dyer Act case, 18 U.S.C.A. 2312, appellant Bray contends (1) that the evidence was insufficient to support the jury verdict against him; (2) that the court below erred in permitting the Government to cross-examine him about his prior criminal record; (3) that the court below erred in permitting the Government to cross-examine him concerning the failure of his witnesses to testify; and (4) that he was denied due process of law because counsel was not appointed to represent him until nine days before his trial. We affirm the judgment below in all respects.
 
 I. SUFFICIENCY OF THE EVIDENCE
 
 2
 The Record reveals that the appellant failed to move for a judgment of acquittal at the close of the evidence. As a general rule, failure to move for an acquittal prevents a reviewing court from considering the sufficiency of the evidence. Sheffield v. United States, 5th Cir. 1967, 381 F.2d 721. Only in an exceptional case, and to prevent a miscarriage of justice, will a reviewing court consider the sufficiency of the evidence when no motion for acquittal has been made. The instant case presents no such compelling situation. The evidence produced was more than ample to support the verdict. The evidence showed that Bray was arrested in Macon, Georgia, on March 18, 1970, for drunken driving. At the time, he was 'navigating' a new 1970 Ford Pickup around the streets of Macon in a highly inebriated condition, without a proper driver's license. The same Ford Pickup was on the same day reported to the FBI as a stolen vehicle. The owner of the truck, a man named Turner, testified that his vehicle was stolen on March 6, 1970. Turner testified further that the day before his truck was stolen, he had been drinking with Bray (whom he had only met once before) and a lady friend in a Memphis bar. The three decided to take a trip to Jackson, Tennessee that night. They traveled to Jackson in Turner's new Ford Pickup, with Bray driving because Turner had drunk too much. The next day they returned to Memphis and continued to imbibe in another Memphis bar. In the middle of the afternoon, according to Turner's testimony, they parted company, and when Turner went back to the parking lot where he had left his truck, he discovered that the truck had been stolen. Turner testified that he reported the theft to the local police that same day, and the next day he reported the theft, in person, to his insurance company in Memphis. He said that about a week later he received a phone call from certain persons in Georgia, informing him that his truck was in their front yard and that it had been left there by the appellant Bray. Turner then reported the theft to the FBI. There followed several witnesses who corroborated substantially all of Turner's testimony.
 
 
 3
 The appellant Bray then took the stand and presented his side of the story. Bray's story coincided with Turner's insofar as their drinking bouts in Memphis and their trip to Jackson, Tennessee were concerned. Beyond that, however, they differed greatly. Bray testified that Turner had asked him to go to Georgia to help him on a welding job. Bray explained further that by this time each of them had picked up a girl friend, so Turner wanted to make the trip in two vehicles since there was not enough room in the cab of the truck for Bray and Turner and two girls. Thus, according to Bray, the two departed on their trip on Friday, March 6, with Turner in an automobile following Bray in the Truck.
 
 
 4
 Bray testified that Turner followed him to Macon, Georgia, where they stopped for more liquor. This was on Staturday night, March 7, according to Bray. Bray stated that at this point he began to think Turner might be up to 'no good' and since he, Bray, had a criminal record, he did not want to become involved in any wrongdoing. Therefore, he informed Turner that he did not want to drive that truck any longer; whereupon, according to Bray, Turner left, telling Bray that he would return with another driver. But Turner never returned, and, since Turner had left Bray with the key to the truck, Bray decided to continue driving the truck to look for Turner. This Bray did, all the while continuing to drink beer and whiskey, until he was arrested for drunken driving on March 18. Bray offered no testimony to corroborate his story. The jury obviously chose not to believe Bray's story, and we think there was ample room for the jury to make this credibility choice. Thus, we reject Bray's contention that the evidence was insufficient.
 
 II. EVIDENCE OF PRIOR CRIMINAL RECORD
 
 5
 After taking the stand in his own defense, and raising the subject of his prior criminal record himself, Bray now complains about the Government's cross-examination concerning his prior criminal record. Two exceptions to the rule prohibiting the introduction of a prior criminal record militate against the appellant's position on this point. The first exception is that a defendant who takes the stand to testify in his own defense may be impeached by proof of prior felony convictions. This exception is well recognized in this Circuit. See, e.g., Loper v. Beto, 5th Cir. 1971, 440 F.2d 934. The second exception is that a cross-examiner may go into anything in his cross-examination that was raised by his opponent on direct examination, and as we stated above, Bray himself raised the subject of his prior criminal record on direct examination. McCormick on Evidence 26, at 43 (1954). Bray argues here, however, that proof of several of his prior convictions should not have been permitted because they were entered on pleas of guilty. Thus, he argues, those convictions have no probative value insofar as his credibility is concerned because they indicated truthfulness in admitting his criminal conduct rather than dishonesty. Bray's argument, of course, misses the point of the impeachment exception. Evidence of prior convictions is admitted to reflect upon the character of a defendant who seeks to earn the confidence of the jury by testifying in his own behalf. The probative fact is not whether he denied or admitted committing the offense for which he was convicted, but whether he committed the offense at all, and, in cases where the conviction rested on dishonest conduct, the probative value of such convictions can be seen quite readily. See Gordon v. United States, 1967, 127 U.S.App.D.C. 343, 383 F.2d 936, 940, cert. denied, 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1968). That Bray pled guilty to the prior offenses, of course, does not change the fact that he was found guilty of committing those offenses. Moreover, a guilty plea is often as much a result of an accused's realistic assessment of his chances to be acquitted should he go to trial as it is a result of any altruistic motive to 'come clean.' McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); Parker v. North Carolina,397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970); Brady v. United States,397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). We therefore reject the appellant's suggestion that convictions based on guilty pleas are somehow excluded from the exception to the rule against admitting character evidence in criminal trials.
 
 
 6
 Bray's second complaint about the evidence of prior convictions introduced in the court below is that one of the prior convictions used was for a Dyer Act offense-- the same offense for which Bray was charged in the instant proceeding. No objection to the introduction of this evidence was made by Bray's counsel. Bray contends, however, that the Government's reference to this prior Dyer Act offense was so highly prejudicial as to be 'plain error' under Rule 52(b), F.R.Crim.P. We disagree. The evidence was plainly admissible under a recent decision of this Court which held that when a defendant takes the stand in a Dyer Act prosecution, he is subject to impeachment, and the Government is entitled to cross-examine him concerning the existence of prior convictions for Dyer Act offenses, as well as other offenses. Bendelow v. United States, 5th Cir. 1969, 418 F.2d 42, 48. Thus, there is no merit to this second prong of appellant's attack on the Government's references to his prior criminal record.
 
 
 7
 Finally, the appellant contends that the Government's cross-examination as to his prior felony convictions was too broad in scope. To evaluate this contention, we have read the transcript of the trial below very closely, and we find that while Bray did go into great detail in discussion his prior offenses on cross-examination, he did so not at the urging of Government counsel, but in his own rush to 'explain away' the convictions. Indeed, the Record indicates that at one point both the Court and counsel for the Government attempted to curtail the defendant's monologue about his prior offenses. Yet defendant's counsel made no objection whatever to the testimony. Therefore, this objection, too, must be evaluated in the light of the 'plain error' rule.
 
 
 8
 Appellant correctly cites the law when he argues that a cross-examiner should limit his questions concerning prior crimes to the number of prior convictions, the nature of each of the crimes charged, and the date and time of each conviction. Beaudine v. United States, 5th Cir. 1966, 368 F.2d 417; McCormick on Evidence 43, at 92 (1954). But this limitation on the scope of the cross-examiner's questioning does not necessarily mean that the witness himself should similarly be cut off from explaining or extenuating the conviction or denying his guilt. See McCormick on Evidence 43, at 93 (1954).
 
 
 9
 We conclude, therefore, that the appellant's charge that the prosecuting attorney went beyond the permissible limits in questioning the appellant about his prior convictions is not supported by the Record. Certainly, there was no 'plain error' involved.
 
 
 10
 III. CROSS-EXAMINATION CONCERNING THE FAILURE OF APPELLANT'S WITNESSES TO TESTIFY
 
 
 11
 After Bray told the jury the story about his trip to Georgia with Turner, suggesting that he could not have stolen Turner's truck because Turner was with him at the time, counsel for the Government on cross-examination asked Bray whether there was anyone who could corroborate his story.
 
 
 12
 Bray replied that there were witnesses who had seen him with Turner in Macon, but that the Government had 'scared' them. Counsel for the Government questioned Bray further about this charge that his witnesses had been 'scared,' and it was brought out in the course of this questioning that Bray's witnesses had been subpoenaed by the Government for Bray's convenience, and that when they appeared, none of them was able to corroborate Bray's story. Bray's counsel made no objection whatever to the Government's questioning on this point. Moreover, it was Bray himself, by charging on cross-examination that the Government had 'scared' his witnesses, who provoked much of the questioning about the failure of his witnesses to testify. We have reviewed the trial transcript on this point in search for the 'plain error' we must find in order to sustain Bray's objections here that he failed to make below. Rather than convince us that 'plain error' was committed, the transcript impresses us with the fact that Bray was quite eager to go into the matter of his witnesses' failure to testify, and that the Government needed to reveal what really happened in order to discredit Bray's charges of intimidation. We have concluded, therefore, that no 'plain error' was committed.
 
 IV. DEPRIVATION OF RIGHT TO COUNSEL
 
 13
 Bray contends that the trial court erred as a matter of law in setting the trial only nine days after counsel had been appointed to represent him. He contends that his court-appointed counsel did not have time to prepare for the trial in this short time. Thus, he argues, even though he made no motion for a continuance the court below should have postponed the trial on its own motion.
 
 
 14
 There is, of course, very little merit to this argument; but what little merit it might have possessed disappeared completely when we studied the Record in this case. Here is what the Record reveals: Counsel was appointed to represent the appellant on October 13, 1970. Nine days later, on October 22, 1970, the case went to trial. The October 22 trial resulted in a mistrial. Therefore, a new trial was set for November 12, and it was at this November 12 trial that appellant was convicted. Rather than having only nine days to prepare, therefore, appellant's counsel had a full month, with the benefit of a dress rehearsal in the first trial. We therefore reject outright appellant's claim that he was denied due process because of late appointment of counsel.
 
 
 15
 Affirmed.