UNITED STATES of America

v.

**Carlos NAZIR, David Gaudio, Francisco Munoz, Alberto Llona, Prescription Specialties, Inc., & U.S. One Tele-marketing, Inc.**

No. 01–1029–CR.

United States District Court, S.D. Florida.

July 16, 2002.

Christopher J. Clark, Assistant U.S. Attorney, Miami, FL, for United States.

Ricahrd Sharpstein, Miami, FL, for Carlos Nazir.

Alan Sobol, O'Connell Flatherty & Attmore, LLC, Hartford, CT, David Rothman, Thronton & Rothman, P.A., Miami, FL, for David Gaudio.

Jose Quinon, Miami, FL, for Francisco Munoz.

Faith Gay, White & Case LLP, Mimai, FL, for Alberto Llona.

Harvey Rogers, Miami, FL, for U.S. One Telemarketing, Inc.

JORDAN, District Judge.

### ORDER DENYING MOTION TO DISMISS COUNTS 15–24

The defendants move to dismiss counts 15–24 of the indictment on the ground that they fail to allege criminal offenses. For the reasons which follow, the motion to dismiss [D.E. 81] is DENIED.

### I

The indictment alleges that defendant Carlos Nazir, a physician licensed to practice in the state of Florida, wrote "false prescriptions" for prescription drugs ("Power Gel" and "Vigor") which had not been approved by the FDA, referring to them respectively as "tri-mix" and "bi-mix." *See* Indictment at ¶¶ 8, 12–13, 17. Dr. Nazir, according to the indictment, "used the names of patients in his medical practice … without their knowledge or permission for the prescriptions that were sent" to co-defendants David Gaudio and Prescription Specialties, Inc. "These patients never received the drugs as reflected on the false prescriptions." *See id.* at ¶ 18. Instead, Mr. Gaudio and Prescription Specialties filled the false prescriptions, caused bulk shipments of the drugs to be mailed to Dr. Nazir, and simul-

taneously sent invoices for the false shipments to co-defendants Francisco Munoz, Alberto Llona, and U.S. One Telemarketing, Inc. *See id.* at ¶ 19. Dr. Nazir then forwarded the drugs to Mr. Munoz, Mr. Llona, and U.S. One Telemarketing for repackaging and further shipment to "unsuspecting customers throughout the United States." *See id.* at ¶ 20. Mr. Munoz, Mr. Llona, and U.S. One Telemarketing caused monies to be paid to Dr. Nazir "in exchange for his role in writing prescriptions." These monies were "commissions [Dr. Nazir] was to receive from sales of 'Power Gel' and 'Vigor.'" *See id.* at ¶ 25. Mr. Munoz, Mr. Llona, and U.S. One Telemarketing also caused payments to be made to Dr. Nazir, through International Urological Consultants, "for his role in writing phony prescriptions." *See id.* at ¶ 26.

Counts 15–20 charge all of the defendants with the dispensing of prescription drugs without a prescription, and with the intent to defraud or mislead, in violation of 21 U.S.C. §§ 331(a) and 333(a)(2). Each of these counts alleges that on a particular date, "Power Gel" or "Vigor" were dispensed contrary to 21 U.S.C. § 353(b)(1), "in that the drugs were dispensed without the prescription of a practitioner licensed by law to administer them, which resulted in the drugs being misbranded while held for sale."

Counts 21–24 are similar. These counts charge all of the defendants with the dispensing of prescription drugs (i.e., "Power Gel" or "Vigor") on certain dates without a valid prescription, and with the intent to defraud or mislead, in violation of 21 U.S.C. §§ 331(k) and 333(a)(2). The counts allege that the drugs were dispensed contrary to 21 U.S.C. § 353(b)(1), "in that the drugs were dispensed without

the prescription of a practitioner licensed by law to administer them," which "resulted in the drugs being misbranded."

## II

Under 21 U.S.C. § 331(a), it is unlawful to "introduc[e] or deliver[] for introduction into interstate commerce ... any ... drug ... that is adulterated or misbranded." And under § 331(k), it is unlawful to commit any act "while [an] article is held for sale ... after shipment in interstate commerce and [which] results in the article being adulterated or misbranded." If committed with the "intent to defraud or mislead," a violation of § 331(a) is punishable by up to three years in prison and a fine of up to $10,000. *See* 21 U.S.C. § 333(a)(2).

In turn, 21 U.S.C. § 353(b)(1), which was added to the Food, Drug, and Cosmetic Act in 1951, provides in pertinent part as follows:

**(b) Prescription by physician**....

(1) A drug intended for use by man which—

(A) because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug;

(B) is limited by an approved application under section 355 of this title to use under the professional supervision of a practitioner licensed by law to administer such drug,

. . . .

shall be dispensed only (i) *upon a written prescription of a practitioner licensed by law to administer such drug,* or (ii) upon an oral prescription of such practitioner which is reduced promptly to writing and filled by the pharmacist, or (iii) by refilling any such written or

oral prescription.... The act of dispensing a drug contrary to the provisions of this paragraph shall be deemed to be an act which results in the drug being misbranded while held for sale.

(emphasis added). As explained in *United States v. Carlisle*, 234 F.2d 196, 199 (5th Cir.1956), a violation of § 353(b)(1) constitutes misbranding and is punishable under § 331.

## III

The indictment alleges that Dr. Nazir—with the intent to defraud or mislead—wrote false "Power Gel" and "Vigor" prescriptions for patients of his whom he never evaluated with respect to these drugs, and that the customers who ultimately received the drugs were never examined by, or consulted, a doctor about the drugs. In short, the indictment charges that the defendants used Dr. Nazir's so-called phony prescriptions as a means for unlawfully delivering the drugs to individuals without the benefit of medical consultations or examinations.

The defendants, invoking the rule of lenity, nevertheless argue that counts 15–24 fail to state criminal offenses because the indictment alleges that Dr. Nazir in fact issued prescriptions for "Power Gel" and "Vigor." In the defendants' view, § 353(b)(1) says only that a prescription by a licensed doctor is required, and it makes no difference whether the prescription is phony. If a doctor signs a paper prescribing a drug for someone—no matter what the circumstances—there can be no misbranding under the statute. The government, on the other hand, asserts that a phony prescription is no prescription at all under § 353(b)(1), and that the so-called prescriptions issued by Dr. Nazir caused the "Power Gel" and "Vigor" to be misbranded. The critical question, then, is the meaning of the word "prescription" as it is used in the statute. *See generally United States v. Plummer,* 221 F.3d 1298,

1302 (11th Cir.2000) (in reviewing a motion to dismiss an indictment, a court looks only at whether the government has alleged each of the elements of the relevant statute).

▓▓▓▓ As in other contexts, the starting point in the interpretation of a criminal statute is the text employed by Congress. *See, e.g., Staples v. United States,* 511 U.S. 600, 605, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994); *United States v. Rojas–Contreras,* 474 U.S. 231, 234, 106 S.Ct. 555, 88 L.Ed.2d 537 (1985); *United States v. Diaz–Clark,* 292 F.3d 1310, 1315 (11th Cir. 2002). Because § 353(b) does not define the word "prescription," it should be given its ordinary meaning and usage. *See, e.g., United States v. Chamberlain,* 159 F.3d 656, 661 (1st Cir.1998) (consulting dictionary to interpret the word "commitment" in 18 U.S.C. § 922(g)(4)). The dictionary definition of the word, in this medical context, is "a written direction for the preparation, compounding, and administration of a medicine." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1792 (1976). The medical literature contains similar, but more expansive, definitions. One dictionary, for example, defines a "prescription" as "a written direction for the preparation and administration of a remedy. A prescription consists of the heading or *superscription*—that is, the symbol Rx or the word Recipe, meaning 'take'; the *inscription,* which contains the names and quantities of the ingredients; the *subscription,* or the sign S. for *sig'na,* 'mark,' which gives the directions for the patient which are to be marked on the receptacle." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1349 (28th ed.1994). And, as quoted in a Fifth Circuit case, a pharmacology textbook from around the time when § 353(b)(1) was enacted provided the following definition:

A prescription, by strict definition, is a physician's written order to a pharma-

cist for medicinal substances for a patient. It includes directions to the pharmacist regarding the preparation and to the patient regarding the use of the medicine.

In reality, however, a prescription is infinitively more than can be simply defined. It is a summary of the physician's diagnosis, prognosis, and treatment of the patient's illness. It brings to a focus on one slip of paper the diagnostic acumen and therapeutic proficiency of the physician. The prescription is an important practical phase in the application of pharmacology to clinical medicine, and combines the knowledge of the absorption, fate, excretion, action, toxicology, and dosage of drugs with the requirements for restoration of the patient's health.

*De Freese v. United States,* 270 F.2d 730, 733 n. 4 (5th Cir.1959) (quoting GOODMAN & GILMAN, THE PHARMACOLOGICAL BASIS OF THERAPEUTICS 1759 (2d ed.1955)). Given these definitions, it seems to me that the word prescription in § 353(b)(1), in common parlance, means only a bona fide order—i.e., directions for the preparation and administration of a medicine, remedy, or drug for a real patient who actually needs it after some sort of examination or consultation by a licensed doctor—and does not include pieces of paper by which physicians are directing the issuance of a medicine, remedy, or drug to patients who do not need it, persons they have never met, or individuals who do not exist.

The structure and purpose of § 353(b)(1) also support the government's interpretation. First, it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal v. United States,* 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993). The statute at issue here re-

quires a prescription because certain drugs are not safe for use except under the "supervision" of a licensed practitioner. Supervision entails some sort of active (and good-faith) participation by a physician in his professional capacity, and I doubt very much that Congress meant to permit a doctor (and/or others) to avoid this provision by simply writing out a phony order for drugs for a person he never examined or consulted. Second, as the Supreme Court explained over fifty years ago, "the high purpose of the [Food, Drug, and Cosmetic] Act [is] to protect consumers who under present conditions are largely unable to protect themselves in this field." *Kordel v. United States*, 335 U.S. 345, 349, 69 S.Ct. 106, 93 L.Ed. 52 (1948). Likewise, one of the purposes of § 353(b)(1) is to "protect the public from abuses in the sale of potent prescription drugs." *De Freese*, 270 F.2d at 735 (discussing legislative history). This purpose would be eviscerated if the defendants' reading of the statute were adopted. In my view, the issuance of phony "prescriptions" without any medical need or examination, for the purpose of getting drugs into interstate commerce where they can be sold to unsuspecting consumers, constitutes misbranding under § 353(b)(1), which is prohibited by §§ 331(a) and 331(k). "There is no canon against using common sense in reading a criminal law, so that strained and technical constructions do not defeat its purpose by creating exceptions from or loopholes in it." *Kordel*, 335 U.S. at 349, 69 S.Ct. 106.

The defendants' reading of § 353(b)(1), moreover, is difficult to sustain in light of *Webb v. United States*, 249 U.S. 96, 99–100, 39 S.Ct. 217, 63 L.Ed. 497 (1919), which construed the word "prescription" in a criminal prosecution under § 2 of the Harrison Act, 38 Stat. 785, Comp.St. § 6287h. In relevant part, the Act prohibited selling, dispensing, or distributing certain drugs or their compounds. One of the Act's exceptions, contained in § 2(b), allowed the sale, dispensation, or distribution "by a dealer under and pursuance of a written prescription issued by a physician." [1] Webb, a licensed physician, and Goldbaum, a retail druggist or pharmacist, were convicted under the Act for their part in a scheme similar to the one alleged in this indictment. Webb would prescribe morphine to habitual users upon their application, but in issuing these prescriptions he would only consider the "quantities the applicant desired for the sake of continuing his accustomed use." *Id.* at 97–98, 39 S.Ct. 217. Goldbaum, who knew of Webb's practice, habitually filled the prescriptions. Indeed, Webb and Goldbaum had agreed that Goldbaum would procure a stock of morphine, "which morphine he should and would sell to those who desired to purchase and who came provided with Webb's so-called prescriptions. It was the intent of Webb and Goldbaum that morphine should thus be furnished to the habitual users thereof by Goldbaum and without any physician's prescription issued in the course of a good faith attempt to cure the morphine habit." *Id.* at 98, 39 S.Ct. 217. Webb charged fifty cents per prescription, and during the period in question Goldbaum filled over four thousand prescriptions. *See id.* After Webb and Goldbaum were convicted, the Sixth Circuit certified to the Supreme Court three questions concerning the Harrison Act, including the following one:

3. If a practicing and registered physician issues an order for morphine to a habitual user thereof, the order not being issued by him in the course of pro-

---

**1.** The text of § 2 of the Harrison Act is quoted in *United States v. Doremus*, 249 U.S. 86, 91—92, 39 S.Ct. 214, 63 L.Ed. 493 (1919), a companion case to *Webb* which upheld the Act against a constitutional challenge.

fessional treatment in the attempted cure of the habit, but being issued for the purpose of providing the user with morphine sufficient to keep him comfortable by maintaining his customary use, is such order a physician's prescription under exception (b) to section 2? *Id.* at 99, 39 S.Ct. 217. The Supreme Court had little difficulty in holding that Webb's orders for morphine were not "prescriptions" under § 2(b): "As to question three—to call such an order for the use of morphine a physician's prescription would be so plain a perversion of meaning that no discussion of the subject is required. That question should be answered in the negative." *Id.* at 99–100, 39 S.Ct. 217.[2]

The defendants attempt to distinguish *Webb* by pointing out that the Harrison Act outlawed illegal drugs that were both hazardous and addictive. In their view, that is why the Supreme Court required that a "prescription" under § 2(b) be preceded by a physical examination of the patient by the doctor. I do not find this parsing of *Webb* persuasive. Though § 2(b) of the Harrison Act and § 353(b)(1) are not necessarily identical in language or purpose, even legal beneficial drugs can be dangerous when used by persons who do not need or cannot tolerate them. *See De Freese,* 270 F.2d at 735. It may not be appropriate to infer that Congress meant to incorporate the *Webb* holding when it used the word "prescription" in § 353(b)(1),[3] but *Webb* nevertheless remains a useful guidepost in the common-law method of analyzing precedent on similar issues.

Turning back to the statute at issue here, the Fifth Circuit examined § 353(b)(1) in *Brown v. United States,* 250 F.2d 745, 746–47 (5th Cir.1958), where a doctor was convicted for giving undercover agents certain drugs without preparation, written prescription, or examination. Citing *Webb,* the Fifth Circuit held that under § 353(b)(1) it is proper for the jury to consider whether a "doctor-patient relationship existed," for that issue "bears on the question whether there had ever been a 'prescription' for the agents." *Id.* at 747. Although the defendants correctly point out that *Brown* is not controlling because it involved no prescription whatsoever, they are wrong in dismissing the case as irrelevant. Like *Webb, Brown* indicates that a "prescription" under § 353(b)(1) means more than just a phony piece of paper signed by a doctor for drugs. *Cf. White v. United States,* 399 F.2d 813, 818 (8th Cir.1968) (upholding conviction of a physician under 21 U.S.C. §§ 360a(a)(4) and 360a(b)(1) for issuing prescriptions without ever seeing or meeting with one of the people to whom he sold drugs).

■ In short, the defendants' reliance on the rule of lenity is misplaced. The rule "does not apply if the ambiguous reading relied on is an implausible reading of the congressional purpose," *Caron v. United States,* 524 U.S. 308, 316, 118 S.Ct. 2007, 141 L.Ed.2d 303 (1998), and under the general rules of statutory construction discussed above, the word "prescription" cannot be defined as mere piece of paper signed by a doctor for drugs, no matter how fraudulent. *See also Johnson v.*

---

**2.** *See also Fuey Moy v. United States,* 254 U.S. 189, 194, 41 S.Ct. 98, 65 L.Ed. 214 (1920) ("[Under the Harrison Act] a 'prescription issued for [sale to a dealer or for distribution to satisfy an addiction]' protects neither the physician who issues it nor the dealer who knowingly accepts and fills it.").

**3.** *See Tafflin v. Levitt,* 493 U.S. 455, 463, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990) ("The 'mere borrowing of statutory language does not imply that Congress also intended to incorporate all of the baggage that may be attached to the borrowed language.' ").

1378

*United States,* 529 U.S. 694, 713 n. 13, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) ("Lenity applies only when the equipoise of competing interests cannot otherwise be resolved.").

### IV

■ Given the facts alleged in the indictment, the false orders for "Power Gel" and "Vigor" written by Dr. Nazir are not "prescriptions of a practitioner authorized by law to administer" them under 21 U.S.C. § 353(b)(1). Thus, counts 15–24 of the indictment sufficiently allege criminal violations of 21 U.S.C. §§ 331(a) and 331(k) as a result of misbranding.