RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0130p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

PETER BOLOS,

*Defendant-Appellant*.

Nos. 22-5486/5605

Appeal from the United States District Court for the Eastern District of Tennessee at Greeneville.
No. 2:18-cr-00140-2—J. Ronnie Greer, District Judge.

Argued:  February 1, 2024

Decided and Filed:  June 12, 2024

Before:  SILER, NALBANDIAN, and MATHIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Scott Burnett Smith, BRADLEY, ARANT, BOULT CUMMINGS LLP, Huntsville, Alabama, for Appellant.  Brian Samuelson, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.  **ON BRIEF:**  Scott Burnett Smith, Hunter W. Pearce, BRADLEY, ARANT, BOULT CUMMINGS LLP, Huntsville, Alabama, R. Sumner Fortenberry, BRADLEY ARANT BOULT CUMMINGS LLP, Jackson, Mississippi, for Appellant.  Brian Samuelson, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

───────────────

## OPINION

───────────────

SILER, Circuit Judge.  A jury convicted Defendant, Dr. Peter Bolos, of mail fraud, conspiracy to commit healthcare fraud, and felony misbranding as part of a complex scheme.

That scheme saw him and his co-conspirators accumulate millions of dollars from pharmacy benefit managers ("PBMs").  On appeal, he makes the bold claim that nothing he did was unlawful and that he is being unfairly held criminally culpable for contractual violations and others' misconduct.  We disagree and affirm.

**I.**

In 2013, Bolos purchased an interest in Florida-based pharmacy Synergy Pharmacy Services and assumed the position of managing partner.  Co-defendant Andrew Assad served as the pharmacist-in-charge.  Co-defendant Mike Palso served as the COO.  Together, they believed they could build a better pharmacy that didn't practice some of the "archaic" processes common in the industry.  Synergy obtained licenses as a telehealth pharmacy in several states, including Tennessee.

Eventually, in 2015, Synergy signed an agreement with HealthRight, a telemarketing firm, to generate business for Synergy.  HealthRight used social media advertisements and large phone banks to generate potential clients for Synergy.  The social media advertisements asked viewers if they experienced pain and then asked them to fill out a voluntary survey.  When users did this, they were promptly contacted by a HealthRight telemarketer—or "health advocate," as HealthRight called them—who asked the patient various "intake" questions like they might experience at a doctor's office.  The agent also secured their medical history, insurance status, and details about their pain complaints.  Based on the information provided during the call with the agents, agents asked qualifying patients if they wanted a consultation.  If they agreed, the patient was transferred to the "care platform" to collect their medical information and enter it into HealthRight's system.

This information was then forwarded to a licensed doctor in the patient's home state for review.  That doctor decided whether to issue a prescription to the patient.  Most of those decisions were made without the doctor ever seeing or speaking to the patient.  In fact, 90% of the prescriptions were issued without any live contact between the patient and the doctor.  The doctors then sent the prescriptions to Synergy for filling.

Bolos kept track of what medications were reimbursed by insurance companies at the highest profits. So Synergy provided HealthRight with prescription pads and lists of recommended substitutes to direct patients towards those profitable medications. In fact, HealthRight would screen out patients who could not be treated with Synergy's preferred medications. Then, when HealthRight transferred the prescription pad to the doctors for a possible prescription, they told the doctors that the patients had expressed interest in those medications. When a doctor opted not to write a prescription, the file was submitted to another doctor for a "second opinion." The "vast majority" of prescriptions also included a substitution list, which authorized Synergy to choose from an alternate list if the doctor's primary choice was not covered by the patient's insurance, but doctors were not notified when Synergy opted to make this swap.

Once the prescriptions were transmitted to Synergy, it mailed the prescribed medication to the patient and billed the PBMs. The transmittal and payment process through the PBMs was handled electronically, with payment being approved nearly instantly through their internal system, at a reimbursement price already set.

In summary, Synergy employed HealthRight to bring it eligible patients, suffering from pain of some kind, who could be helped by a list of medicines which Synergy wished to sell, likely because of their favorable profitability. HealthRight used social-media advertising to find members of the public suffering from pain who were willing to talk to a telemarketer. These people were then offered a consultation. When they accepted, a second telemarketer secured their insurance information, medical history, and other information, which was then relayed to a licensed physician for a decision on a prescription. The doctors usually issued a prescription, and did so without speaking to the patient. The prescription was then transmitted to Synergy for fulfillment. After that, Synergy would mail the medicine to the patient and bill the PBM.

But there were wrinkles. Several of them, in fact. First, it is undisputed that selling prescriptions is illegal. *See, e.g.*, Fla. Stat. § 465.185(1). But whether the contract between Synergy and HealthRight was in fact selling prescriptions is the subject of hot dispute on appeal. The government cites the trial testimony of Scott Roix, CEO of HealthRight. Roix testified that the two businesses worked around this prohibition by estimating the number of prescriptions

which would be generated by HealthRight and then using that estimate to arrive at a yearly lump sum payment that Synergy would make to HealthRight, ostensibly to support the staffing involved on the contract. However, Bolos periodically compared this payment with the real number of prescriptions that HealthRight referred to ensure that Synergy was not overpaying for HealthRight's services, as measured on a per-prescription basis.

Bolos, on the other hand, discounts all this as mere speculation. He claims that "the evidence is undisputed that Synergy paid HealthRight the same amount each week, regardless of the resulting number of new patients or prescriptions." He likewise stresses that he consulted with counsel on the entire contract and, in fact, cancelled a previous contract that counsel thought was too close to criminal conduct.

Second, Tennessee law (where all the indicted counts occurred) requires pharmacies to employ a "pharmacist-in-charge" licensed by the state. Because Assad did not have the necessary license, Bolos asked his cousin Maikel, who was a licensed Tennessee pharmacist, to be the company's pharmacist-in-charge in name only. But Maikel did not work at the pharmacy for the required minimum 20 hours per week, and therefore did not qualify as the pharmacist-in-charge. Yet he was paid $500 a month to sign applications and hold himself out as such.

Third, Synergy routinely did not collect copays from its patients despite being required by its PBM contracts to do so. These payments serve as a proxy for necessity and help ensure that patients are invested in getting the care the insurer is being asked to pay for. However, because of the methods by which HealthRight obtained the patients, many if not most were unwilling to pay the copays because they didn't see a doctor, didn't want the medicine, or for some other reason. Faced with this difficulty, Synergy collected "virtually zero" copays from HealthRight patients. Synergy claims that it did make efforts to collect copays, but those efforts were half-hearted at best; for smaller copays, Synergy would call once and leave a message. Nonpayment of a copay would not stop them from shipping the medications, and Synergy never sent any HealthRight patients to collections for failing to pay their copays. Bolos knew that Synergy was not collecting copays from HealthRight patients, knew that there was an outstanding copay balance of over a million dollars, and reviewed call scripts for use by the telemarketers to ensure they obtained permission to send the prescriptions even without a copay.

Synergy then went a step further. To help the HealthRight patients pay their copays, Bolos and Palso worked with a friend, Rani Shehata, to set up a third-party entity that would transmit money to HealthRight patients so they could pay their copays to Synergy. Shehata's organization received money from Synergy along with a list of HealthRight patients to call. He then asked the patients to complete a short survey for money, which they were then encouraged to use to pay their outstanding balance with Synergy. Because copays could be different, patients would be offered different amounts to complete the same survey. In this way, Synergy effectively funded its own copays. In 2016, Bolos created a coupon system that operated for the same purpose by making PBMs think that Synergy was collecting copays.

Fourth, Bolos and Synergy routinely concealed the nature of their business operations from the PBMs with whom they had contracts. First, Synergy sought to conceal its relationship with HealthRight, even when PBMs explicitly asked about it, to the point of removing HealthRight's name from prescriptions submitted for payment. Second, Express Scripts' contract with Synergy required all prescriptions submitted for payment be the result of a valid doctor-patient relationship formed in an "interaction between a patient and a doctor." As discussed above, in the vast majority of cases, doctors prescribed medications without ever seeing or speaking with their supposed "patients." The contract also prohibited Synergy from funding its own copay system or routinely failing to collect copays. Third, Synergy expressly represented that it was primarily an "open door" pharmacy without any mail-order business, when in fact it was almost exclusively mail-order. At the time, Express Scripts was not doing business with mail-order pharmacies. Fourth, Synergy responded to audits by CVS Caremark by changing records—including statements, credit-card receipts, and software notes—to make it appear that they had collected copays. One of Synergy's executives even had a "final notice" stamp purchased for the office so they could make envelopes appear more authentic. Jennifer Dillon, a Synergy employee responsible for audit responses and who worked closely with Synergy management, including Bolos, testified that Bolos was aware of these falsifications. Fifth, Assad told CVS Caremark on an audit call that Synergy did not use any outside marketing, that they spoke with every patient, that they collected copays before mailing the medications, and called patients to verify if they had any allergies. Bolos later learned of the call.

As a result of this audit, CVS Caremark terminated its relationship with Synergy. At trial, representatives from CVS Caremark and Express Scripts testified in the hypothetical that several facts that Synergy had concealed would have been material to their decision to contract with Synergy or to reimburse its prescriptions, including: (1) that doctors didn't know what medications were actually being dispensed to patients; (2) that Synergy was buying prescriptions; (3) that the prescribing doctors had no real relationship with the patients to whom they prescribed; (4) that Synergy was falsifying its internal documents in response to audits; (5) that Synergy was not collecting copays as required by the PBM contracts; (6) that Synergy funded its own copays; and (7) that Synergy obtained one or more state licenses by making false representations in its applications. Synergy's owners then formed Precision Pharmacy Management, a separate company established to handle prescriptions through a network of affiliate pharmacies after CVS Caremark terminated its contract with Synergy, and neglected to disclose their ownership stakes.

In the end, Bolos was charged in the Eastern District of Tennessee with mail fraud, conspiracy to commit healthcare fraud, and felony misbranding. After a four-week trial, the jury convicted him on all counts. Bolos renewed his motion for a judgment of acquittal and moved for a new trial. The district court denied both motions and sentenced him to a total of 168 months' incarceration and 3 years of supervised release.

**II.**

This is a dispute over whether Synergy's material falsehoods in its dealing with PBMs rise to the level of healthcare and mail fraud. Bolos does not claim that he did not breach contracts and potentially violate state statutes and regulatory law; but he does argue that his offenses, such as they are, do not fit into the statutes charged. His recurring refrain is that the government seeks to make contractual disputes and state regulatory violations into federal criminal offenses, but because the contracted parties all "received the benefit of the bargain," there was no fraudulent acquisition of money or property. He is wrong, and for the following reasons, we affirm his conviction.

**A.**

The federal mail-fraud statute criminalizes "scheme[s] or artifice[s] to defraud, or for obtaining money or property by means of false or fraudulent pretenses." 18 U.S.C. § 1341. This statute does not cover "intangible rights," but instead only covers "the kind of 'property' rights [traditionally] safeguarded by [] fraud statutes." *United States v. Sadler*, 750 F.3d 585, 591 (6th Cir. 2014); *see also Ciminelli v. United States*, 598 U.S. 306, 315–16 (2023) (endorsing *Sadler*'s view of the reach of federal mail- and wire-fraud statutes and applying that standard nationwide).[1] Therefore, any intangible rights such as the "right to valuable economic information needed to make [a] discretionary economic decision[]" are not covered by the statutes. *Ciminelli*, 598 U.S. at 316.

This limitation is grounded in the statutory text and the federalism concerns implicated by a theory that has the potential to "criminalize[] traditionally civil matters and federalize[] traditionally state matters." *Id*. As we noted in *Sadler*, "[l]ightly equating deceptions with property deprivation . . . would occupy a field of criminal jurisdiction long covered by the States," and thereby approve a "sweeping expansion" of federal prosecutorial power. 750 F.3d at 591. Routine contract disputes or violations which incidentally involve the mail would be potential criminal offenses with stiff penalties for executives on either side, and withholding information from another party in business would carry the same risk. *See Ciminelli*, 598 U.S. at 315. "But not every corrupt act by state or local officials is a federal crime," and "the Federal Government [does not have the power to] use the criminal law to enforce (its view of) integrity in broad swaths of state and local policymaking." *Kelly v. United States*, 590 U.S. 391, 404 (2020).

Bolos doesn't just echo these concerns, he stridently maintains that despite *Sadler* and *Ciminelli*, this is exactly the dystopia in which he is living. And it is true that federal courts have vacated criminal convictions which were based in a "right to control" theory of the federal mail- and wire-fraud statutes. *See id*. at 398–402 (vacating the wire- and mail-fraud convictions of two

---

[1]*Sadler* and *Ciminelli* both concern wire fraud under 18 U.S.C. § 1343, rather than mail fraud under § 1341, but the federal mail- and wire-fraud statutes share the same language in the material parts, so the analysis is the same, and cases are cited interchangeably. *Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987).

government officials who intentionally created a traffic jam on the George Washington Bridge as political retaliation); *Cleveland v. United States*, 531 U.S. 12, 20–25 (2000) (reversing a Fifth Circuit decision upholding a mail-fraud conviction based on lies petitioners told in their application for a video-poker license); *Sadler*, 750 F.3d at 591–92 (vacating a wire-fraud conviction where the defendant purchased drugs from a wholesaler and lied about their intended medical use). But that does not mean that the fraud statutes are completely toothless. It is still a crime to defraud another of "money or property." 18 U.S.C. § 1341.

But the cases where convictions were vacated all involved prosecutors who attempted to shoehorn bad facts into the fraud statute and were rebuked on appeal. Take *Sadler*, for example, a case that Bolos claims absolutely controls this one. There, the government charged Nancy and Lester Sadler with running a pain-management clinic that essentially operated as an illegal narcotics dispensary. *Sadler*, 750 F.3d at 588–89. The clinic operated in Garrison, Kentucky, and later in Waverly, Ohio, and proved extremely popular. *Id*. "Patients" lined up well before the clinic opened, arrived to a staff who had in many cases already filled out their prescriptions, and then left, "almost skipping" with excitement. *Id*. The clinic processed "[a]s many as 100 people per day" and predictably lost its license to operate after the DEA investigated. *Id*. at 589. The government charged the Sadlers with a number of crimes, including wire fraud based on Nancy Sadler's mail-order purchase of the drugs involved. *Id*. at 590. She would purchase the drugs from a wholesaler using the supervising physician's DEA license number and a fake name, telling the wholesaler that the drugs were for "indigent patients." *Id*. (quotations omitted). Because the purchases involved the use of "faxes, phone calls and other interstate wire communications," the government charged Nancy with wire fraud. *Id*.

We rejected this theory because the statute only criminalizes one kind of scheme: "schemes intended to deprive people of their money or property." *Id*. (cleaned up). Sadler paid "the going rate for a product," which "does not square with the conventional understanding" of "deprive." *Id*. The government never proved that Sadler's intention was to fraudulently obtain the distributors' property; she had "unflattering motives" to be sure, "but unfairly depriving the distributors of their property was not one of them." *Id*. "[S]he ordered pills and paid the distributors' asking price, nothing more." *Id*. We rejected the right-to-accurate-information

theory because it is not "the kind of property rights safeguarded by the fraud statutes." *Id*. at 591 (quotations omitted). The Supreme Court endorsed this interpretation in *Ciminelli*, explicitly holding that the fraud statutes do not encompass a right to accurate information. *Ciminelli*, 598 U.S. at 315–16 ("Finally, the right-to-control theory vastly expands federal jurisdiction without statutory authorization. Because the theory treats mere information as the protected interest, almost any deceptive act could be criminal.").

Bolos claims that, like the distributors in *Sadler*, the PBMs here obtained the "benefit of the bargain" and therefore were not defrauded. He claims that the government is charging him with fraud for inducing the PBMs to contract with Synergy and correctly points out that such conduct cannot support a mail-fraud charge. *See, e.g.*, *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) ("Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes."). But he mistakes the character of the indictment. The government is not charging him with fraud to obtain the *contracts* with PBMs, but with fraud to obtain the *money* from them. The first superseding indictment alleged that the purpose of the entire scheme was "to obtain large sums of money." And the government's opening statement told the jury that "Bolos . . . defrauded pharmacy benefit managers, PBMs, out of millions of dollars." That theme continued throughout the trial to this appeal. There is no evidence that the government is trying to charge Bolos in ways that *Ciminelli* and *Sadler* expressly foreclosed.

Plus, there is a deeper issue with Bolos's theory: there was no "bargain" as he explains it. In the cases, such as *Sadler*, vacating fraud convictions based on deceit in the conduct of a business contract, courts note that "paying the going rate for a product" is not fraud, that the defendant "never showed [an intent] to deprive anyone of property," or that "[s]tealing [] pills would be one thing; paying full price for them is another." *Sadler*, 750 F.3d at 590. Bolos latches onto this language and argues that, just like the drug wholesalers in *Sadler*, the PBMs here were never defrauded of their goods but simply paid as their contracts with Synergy

required. But this ignores the fact that Bolos generated the patient's "need" for the medications through artifices designed to conceal the true origins and nature of the prescriptions.

The relationship between Synergy and the PBMs was not akin to a business relationship between, for example, a buyer and a seller of goods. There was no "bargain" as commonly understood because, in the insurance industry, PBMs are not standard businesses holding themselves out as willing to trade their goods for money. Instead, they are guarantors of the vagaries of life, contractually obligated to pay the legitimate healthcare expenses of their insureds. Synergy's actions caused them to pay under those contracts when they otherwise would not have. Any payment by an insurance company is a loss to the company, as shown by the ferocity with which many will fight claims; if that payment—or loss—is incurred in a contractually-recognized way, then it is not a crime to demand payment from the insurer. But if the claim is itself fraudulently generated and submitted, that is fraud. Synergy did not perform a legitimate contractual duty for the PBMs for which they then paid Bolos; instead, Bolos hired HealthRight to generate prescriptions, which he knew the PBMs would not pay for if they knew how they were sourced and generated (and which, in many cases, the patients themselves did not even want), and then tendered those prescriptions to the PBMs for payment. In short, Bolos fraudulently took their money. That is a crime.

As the government points out, this scheme "is analogous to a provider billing for unnecessary drugs or medical procedures." Bolos strenuously argues that there was no harm because the PBMs "paid for real drugs for real patients with real pain based on real prescriptions from real doctors." That is simply irrelevant (and the facts contradict some of those claims). "What matters is that the defendant misrepresented material facts that induced the PBMs to make those payments."

The jury heard ample evidence that Bolos and the Synergy leadership knew that the PBMs would take issue with their business practices and took significant steps to conceal those practices from the PBMs to facilitate the payment of Synergy's claims. The jury also heard evidence that Synergy hired HealthRight to generate business using a contract that constructively paid for prescriptions in violation of the law. They heard evidence that Synergy knew that at least one PBM took issue with HealthRight's methods and refused to do business with

pharmacies that used their services, and therefore Synergy went to great lengths to conceal its relationship with HealthRight. Further, they heard evidence that many, if not most, of the patients Synergy serviced did not really want the medications they were mailed, were in fact surprised when prescription medication showed up at their door without their ever seeing a doctor, and that Synergy therefore avoided charging copays to avoid provoking these patients. The jury also heard that the PBMs required Synergy to collect copays and that, because doing so would jeopardize their business model, Bolos concocted two schemes to fund these copays with Synergy's own money, again violating its agreements with the PBMs. They heard evidence that Bolos and Synergy's senior leadership knew that HealthRight's doctors were not actually meeting their patients, whether through video or phone calls, and therefore were not forming a doctor-patient relationship as required by the contracts and the law. Moreover, they heard extensive evidence that Synergy's executives, with Bolos's knowledge and acquiescence, engaged in an extensive program of falsifying credit card receipts, statements, copay delinquency letters, and even internal system notes to fool the PBMs into thinking that Synergy was collecting copays. Finally, they heard evidence that Synergy's COO, Assad, lied to CVS Caremark's audit team and that Bolos was briefed on it and corrected nothing. From this, a reasonable jury could find Bolos intended to defraud the PBMs. *See United States v. Bertram*, 900 F.3d 743, 749 (6th Cir. 2018) ("[T]he omission of a material fact with the intent to get the victim to take an action he wouldn't otherwise have taken establishes intent to defraud under the wire fraud statute.").

Anchoring all this to the mail-fraud statute is the fact that all the medications prescribed were then mailed to patients. In fact, Synergy was almost exclusively a mail-order pharmacy. This fact, uncontested on the record, provided the final link which satisfies the statute's prohibition on mailing or causing to be mailed an item implicated in fraud. 18 U.S.C. § 1341.

Bolos makes a number of objections to the government's use of certain types of evidence. These objections also fall short.

*Prescription brokering*. Bolos argues there is no proof that HealthRight engaged in "prescription brokering" by illegally selling individual prescriptions to Synergy. Yet, he claims, this allegation is "central" to the government's case. That might look plausible on its face,

thanks to the careful drafting of his contract with HealthRight, which avoided setting forth a quota of prescriptions. However, the jury heard significant evidence from Bolos's co-defendants that this was all a cover-up and that, in reality, the contract was understood between Roix and Bolos as being one for the delivery of individual prescriptions to Synergy and that the contract pricing reflected Synergy's assumption about the number of prescriptions that HealthRight would provide and Synergy's preferred price per prescription. Bolos even periodically cross-checked the number of prescriptions HealthRight sent over with the contract price. Bolos argues that the government cannot use this evidence because it falls into a safe harbor of the federal anti-kickback statute, which preempts Florida's own anti-kickback statute. This is irrelevant because Bolos was not charged with any anti-kickback violations. The evidence was introduced solely to show that Bolos was engaged in behavior which would have foreclosed any payment by the PBMs, had they been aware of it.

*Inflated AWP*. Bolos also argues that the government unjustly relied on an allegedly inflated average wholesale price ("AWP"). This is false, and the district court corrected Bolos's persistent misunderstanding in its original order denying his motion for a judgment of acquittal. R. 768, PageID 11553–54.

*Misleading patients*. Next, Bolos argues that the government cannot claim that he and Synergy misled patients because all the "patients had real pain; voluntarily sought help from real doctors; those doctors issued real prescriptions; and the patients received real medicines." This misses the point. He is not faulted for misleading patients as to the quality or efficacy of the medications he was dispensing. He is faulted for knowingly allowing HealthRight to manipulate patients so as to access their insurance information and then generating prescriptions without a valid doctor-patient relationship, in order to bill the insurer.

*Doctor-patient relationship*. Bolos argues that the doctors' alleged failure to maintain a valid doctor-patient relationship is not chargeable to Synergy because it was solely the doctors' responsibility. While yes, he is correct that it was solely the doctors' responsibility to establish that relationship, it was his responsibility not to fill prescriptions which he reasonably knew were being generated without such a relationship. He is not being made a "guarantor[] of full

regulatory compliance by doctors." Instead he is being held to account for continuing to fill prescriptions that he knew were not properly generated.

*Licensing fraud.* He also argues that, in light of *Cleveland*, his cousin's lack of qualifications to be the pharmacist-in-charge of Synergy and the resulting fraudulent applications for licensing to the state of Tennessee cannot be grounds for a criminal conviction. *Cleveland* invalidated a fraud conviction for lying on an application for a video-poker license. *See Cleveland*, 531 U.S. at 15. That is not what happened here. He is not being charged with fraud for the misrepresentation itself. Instead, he is being held accountable for using that known misrepresentation to fraudulently generate prescriptions for billing to the PBMs.

*Failure to collect copays.* Again, Bolos argues that failure to collect copays was a contractual violation and cannot be the grounds for a criminal prosecution. But he was not charged with failure to collect copays. Instead, that was a piece of evidence that the government relied on to prove that he knew that many, if not most, of the patients did not want these medications when they never met with a doctor and that Synergy believed aggressively pursuing payment of copays would upend its scheme by risking the ire of patients.

We review the denial of Bolos's motion for a judgment of acquittal de novo. *United States v. Ray*, 803 F.3d 244, 262 (6th Cir. 2015). In reviewing the sufficiency of the evidence, we view the evidence "in the light most favorable to the government" and ask "whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *Sadler*, 750 F.3d at 590 (quotations omitted). Applying that standard here, we hold that the government put forward sufficient evidence to show that Bolos and Synergy leadership knew of these deficiencies, and either actively facilitated and furthered them or turned a blind eye, all in an effort to induce PBMs to pay Synergy.

**B.**

The federal healthcare-fraud statute requires the government to prove that Bolos "(1) knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items, or services; (2) executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent

to defraud." *United States v. Hunt*, 521 F.3d 636, 645 (6th Cir. 2008) (quotation omitted). Because he was charged with conspiracy, the government also had "to prove an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the conspiracy." *Id*. at 647 (quotations omitted).

All the facts discussed above also suffice to show healthcare fraud.  Moreover, there is a consistent history of convictions for the billing of unnecessary medicines and procedures, which is analogous to the fraud here. *See, e.g.*, *United States v. Anderson*, 67 F.4th 755, 770–71 (6th Cir. 2023) (upholding conviction of doctor who prescribed medication unnecessarily); *United States v. Chaney*, 921 F.3d 572, 593–95 (6th Cir. 2019) (upholding conviction of doctor who ordered urine drug screens far more than necessary); *United States v. Robinson*, 705 F. App'x 458 (6th Cir. 2017) (upholding conviction of doctor who submitted more than 25,000 Medicare claims for unnecessary optometry services); *United States v. Agbebiyi*, 575 F. App'x 624 (6th Cir. 2014) (affirming the conviction of a doctor who "ordered [a] nerve conduction study for ninety-three percent of his patients").  "It matters not that this health care provider billed for real [prescriptions, issued to] real patients and prescribed by real doctors." *Bertram*, 900 F.3d at 749. For example, in *Bertram*, "[t]he defendants conducted urinalysis tests that they had ample reason to know were medically unnecessary and submitted the bills to Anthem, all the while omitting the date when the tests were ordered and the date when the samples were collected." *Id*.  Here, Synergy and Bolos submitted prescriptions to the PBMs for payment, which they had ample reason to know were fraudulently obtained, while concealing from the PBMs material information about their origins.

Bolos perfunctorily argues that the government has failed to prove materiality and intent and that the government is misinterpreting the statute.  All three arguments fail.  First, the PBMs testified at trial that the kinds of facts Synergy concealed would have been material to their decision to contract with Synergy or to reimburse its prescriptions.  Second, the government presented sufficient evidence to show that Bolos was aware of what his colleagues at Synergy were doing, and conceived the scheme, aided them, or acquiesced.  The fact that he obtained a lawyer to help draft the contract with HealthRight does not prove a lack of intent.  He does not and cannot cite any case that provides a safe harbor to those accused of violating the statute if

they consult with counsel.  Finally, his argument that the Florida anti-kickback statute is preempted is simply irrelevant, as he was not charged with that offense.

As with the mail-fraud conviction, there is ample evidence in the record to support the jury's finding that Bolos conspired to create a scheme with the intent to defraud the PBMs of their money.

## C.

Bolos was convicted of felony misbranding of a drug based on one count of mailing a Lidocaine prescription to a patient without a valid doctor-patient relationship.  The misbranding statute states that "[a] drug intended for use by man which . . . is not safe for use except under the supervision of a practitioner licensed by law to administer such drug . . . shall be dispensed only . . . upon a written prescription of a practitioner licensed by law to administer such drug." 21 U.S.C. § 353(b)(1).  The offense is a felony if the government proves an "intent to defraud or mislead." *Id*. § 333(a)(2).  Bolos argues that he complied with the letter of the law because all the prescriptions were issued by properly licensed physicians.  He therefore argues that not only did he comply with the law, but that the statute is unconstitutionally vague and that he lacked the power to correct the alleged misbranding.  The government argues that it is not enough for the doctor to be adequately licensed but that the statute contains an implied requirement that the prescription itself be "valid" and that the validity requirement in turn requires a sufficiently strong doctor-patient relationship, which was nonexistent here.

We hold that 21 U.S.C. § 353(b)(1) contains an implicit validity requirement.  The statute provides that drugs unsafe for use without "the supervision of a practitioner licensed by law" shall not be dispensed except "upon a written prescription" of such practitioner.  21 U.S.C. § 353(b)(1).  The clear import of this law is to outlaw the distribution of potentially harmful substances except upon the considered and lawful action of a licensed professional.  We cannot agree with Bolos's contention that so long as the dispensing practitioners are duly licensed, any prescription they write is unimpeachable and cannot form the basis of a criminal prosecution.

Our view is not a novel one.  The District Court for the Southern District of Florida came to this same conclusion, itself relying on Supreme Court authority.  *See United States v. Nazir*,

211 F. Supp. 2d 1372, 1374–78 (S.D. Fla. 2002). There, the government charged Nazir with misbranding for issuing prescriptions without examining or evaluating the patients—behavior very similar to that of Bolos. *Id*. at 1372–74. Nazir argued that "[i]f a doctor signs a paper prescribing a drug for someone—no matter what the circumstances—there can be no misbranding under the statute." *Id*. at 1374. The government maintained that "a phony prescription is no prescription at all." *Id*. The court evaluated this as a disagreement over the meaning of the word "prescription" and sided with the government. *Id*. at 1374–75. In doing so, it consulted layman's dictionaries, which provided little guidance, a medical dictionary, which pointed toward the government's position, and finally statutory structure and Supreme Court caselaw. *Id*. at 1375–76. First, the court noted that "it is a 'fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.'" *Id*. at 1375 (quoting *Deal v. United States*, 508 U.S. 129, 132 (1993)). The statute "requires a prescription because certain drugs are not safe for use except under the supervision of a licensed practitioner." *Id*. at 1375–76 (quotations omitted). "Supervision entails some sort of active (and good-faith) participation by a physician in his professional capacity," and it would be very surprising if Congress meant to permit a doctor to circumvent the statute by simply "writing out a phony order for drugs." *Id*. Second, the *Nazir* court also relied on the Supreme Court decision *Webb v. United States*, 249 U.S. 96 (1919), which examined the conviction of a doctor who prescribed morphine to patients without regard for medical necessity, merely providing them what they required to feed their addictions. *Nazir*, F. Supp. 2d. at 1376. The statute at issue in Webb was nearly identical to § 353, prohibiting the distribution of certain drugs without "a written prescription issued by a physician." Harrison Narcotic Drug Act, Pub. L. No. 63-223, § 2, 38 Stat. 785, 786 (1914); *Webb*, 249 U.S. at 97. Webb's orders for morphine were not medically necessary but "rather in such quantities as the applicant desired for the sake of continuing his accustomed use." *Webb*, 249 U.S. at 98. So they were not "prescriptions" under the statute, and the Supreme Court held that to call such an order for the use of morphine a physician's prescription "would be so plain a perversion of meaning that no discussion of the subject is required." *Id*. at 99–100. Applying this reasoning, the *Nazir* court found that § 353 also included an implied requirement that the prescription be valid. *Nazir*, F. Supp. 2d. at 1378. We agree.

**D.**

The government argues that Bolos's constitutional-vagueness argument is forfeited because he failed to raise it in the district court. While Bolos acknowledges that he did not raise it explicitly below, he argues that he "ma[de] the argument in a different manner that can be fairly interpreted as another way of saying the point," which does not result in forfeiture. D. 95 at p.20 (quotations omitted) (quoting *Ogle v. Sevier Cnty. Reg'l Plan. Comm'n*, 838 F. App'x 913, 917 (6th Cir. 2020)). Specifically, he argues that when making his initial Rule 29 motion, he argued that the indictment's misbranding count was "confusing" and "d[id] not give a whole lot of information." The government apparently understood this to be a challenge based on constitutional vagueness and cited several cases upholding the statutory regime in the face of vagueness challenges. We find that this suffices to avoid forfeiture of the argument. *Ogle*, 838 F. App'x at 917.

A statute is impermissibly vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). As written, the statute prohibits the dispensation of dangerous drugs that require professional supervision unless such a professional issues a "written prescription." 21 U.S.C. § 353(b)(1). There is nothing vague about that prohibition, and Bolos does not appear to argue so. And even our holding that § 353 contains an implicit validity requirement does not imply the statute is vague.

Bolos argues that the statute is being applied to him in such a way that he is now responsible for the failures of individual doctors to fulfill their doctor-patient responsibilities, and consequently, prosecutors are empowered to "fill the statute with whatever minutiae of state regulatory law" they want. Again, this mistakes the charges. He is not being held responsible for not establishing a sufficient doctor-patient relationship before dispensing drugs. He is being held responsible for knowing that HealthRight obtained prescriptions without a valid doctor-patient relationship, knowing that such conduct made the ensuing prescriptions fraudulent in the eyes of the PBMs, and forwarding them for billing anyway. His argument here is the same one

he raises at every juncture: that he is being held responsible for others' breach of their duties. That is not the case.

Bolos further argues that he lacked knowledge of this scheme and thus the ability to stop it. He claims that the government asked the jury to "pile inference upon inference." Specifically, Bolos contends the government impermissibly asked the jury to infer that the copay payment schemes were evidence that he knew patients did not want to pay their copays, he developed the scheme because patients were not seeing doctors, and Roix had conversations with Bolos about the lack of doctor-patient relationships. But he cites no authority for why this is not allowed. The government is permitted to ask the jury to make inferences, and so long as those inferences are reasonable, the jury may make them. *See Coleman v. Johnson*, 566 U.S. 650, 655 (2012). In short, Bolos essentially leaves this argument half-formed, merely asserting that he lacked knowledge. The jury justifiably found otherwise.

**E.**

Bolos also challenges the calculation of his sentence. In calculating the sentence, the district court estimated that the actual loss involved in the scheme was over $65 million and under $150 million, triggering a 24-level enhancement. U.S.S.G. § 2B1.1(b)(1). The Guidelines establish that the correct measure of loss is the greater of either the intended loss or the actual loss; the parties agreed that actual loss was the better measure. U.S.S.G. § 2B1.1, cmt. n.3(A). Bolos, however, argued that the court should offset any money "clawed back" by the PBMs against that loss amount.

Actual loss is the "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i). The sentencing court is tasked with making a "reasonable estimate of the loss." *Bertram*, 900 F.3d at 753. In determining whether the 24-level enhancement applies, the judge need only determine if the actual loss amount was between $65 million and $150 million. U.S.S.G. § 2B1.1(b)(1). The plea agreements of Bolos's co-conspirators agreed that the amount of loss was $73,943,708. Assad testified at trial that Synergy made about $80 million from HealthRight prescriptions, and Bolos estimated $90 million. And in his objections to the presentence report, Bolos calculated losses of

$69,585,972.  However, despite arguing that the actual loss amount should be reduced by over $10 million, Bolos offered only one piece of evidence to support that number:  a 66-word email thread between his wife and an accountant.  The district court declined to offset on such sparse evidence.  Therefore, all the credible evidence in the record, including Bolos's own testimony and his co-defendants' plea agreements, show that the actual loss was over $65 million, justifying the enhancement.

Bolos also argued, as he does on appeal, that "only illegitimate claims should be used to calculate loss."  However, the district court found that the government satisfactorily proved that "all of the HealthRight prescriptions were fraudulent and should be used to calculate actual loss."  Bolos now argues that the district court "erred by using gross billings without proof that all claims were fraudulent."  He also claims the district court wrongly applied a provision that allowed it to find the fraud pervasive and thereby bypass any inquiry into which claims were fraudulent and which were not.  This provision can only be applied to fraud involving a federal payor.  *See* U.S.S.G. § 2B1.1 cmt. n.3(F)(viii).  He is wrong on both counts.

First, the district court expressly pointed to the government's proof that all the HealthRight bills were fraudulent, so his contention that the court used gross billings "without proof" is wrong.  Second, the district court never applied the "pervasiveness" presumption that he cites.  While the sentencing judge did use the word "pervasive," that is not the same as applying the presumption, which was never cited or mentioned by the court.  The evidence adduced at trial showed convincingly that Synergy's entire business model was to fraudulently bill PBMs.  Therefore, it was not unreasonable for the district court to find that all Synergy's bills were in fact fraudulent and hold Bolos to account for them.

AFFIRMED.